UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| JAMES DELLINGER, | ) | |
| | ) | |
| *Petitioner*, | ) | |
| | ) | |
| v. | ) | NO. 3:09-cv-404 |
| | ) | VARLAN/SHIRLEY |
| | ) | |
| WAYNE CARPENTER, Warden, | ) | |
| | ) | |
| *Respondent*. | ) | |

## REPORT AND RECOMMENDATION

## I.     INTRODUCTION

Petitioner James Dellinger ("Petitioner"), an illiterate and cognitively impaired inmate, was sentenced to death in his Blount County murder case based on the sole aggravating circumstance of the murder conviction in the Sevier County case at issue here. In this case, Petitioner submitted a 28 U.S.C. § 2254 petition more than two years after the expiration of the applicable one year statute of limitations, seeking to have equitable tolling applied on the basis that counsel abandoned him without notice.

Petitioner contends that Ms. Brockenborough, an attorney with the Post-Conviction Defender's Office ("PCDO"), who unbeknownst to him was suffering from serious mental health issues, along with others in the PCDO, assured him that a federal habeas petition would be filed on his behalf in his Sevier County case by the PCDO, or that the PCDO would engage another attorney to handle the case. Instead, the PCDO attorneys, who also represented Petitioner in his related Blount County death penalty state post-conviction case, abandoned him without notice in relation to his Sevier County federal habeas case. Specifically, Petitioner contends that the PCDO assured him that his case was proceeding and going well, while concealing the fact that

they actually failed to file a timely habeas petition in his Sevier County case. The PCDO never notified him of their omission. Rather, the PCDO admits that they continued to represent Petitioner in his Blount County case, and that they concealed their omissions in his Sevier County case.

On June 12, 2013, Chief United States District Judge Thomas A. Varlan referred this action to the undersigned United States Magistrate pursuant to 28 U.S.C. § 636(b)(1)(B) to conduct an evidentiary hearing to determine the following issues:

1.      whether an attorney-client relationship existed between Petitioner and Attorney Catherine Brockenborough ("Ms. Brockenborough"), Attorney Don Dawson ("Mr. Dawson"), and the Post-Conviction Defender's Office (collectively referred to as the "PCDO") in relation to the filing of Petitioner's federal habeas petition in his Sevier County case;

2.      whether Ms. Brockenborough's mental illness and/or the alleged abandonment by the PCDO constitute an extraordinary circumstance under the standard espoused in *Holland v. Florida*, 560 U.S. 631 (2010);

3.      whether Petitioner diligently pursued his federal habeas remedies in his Sevier County case; and

4.      any other matter the undersigned deems appropriate.

Pursuant to the Court's Order, the parties entered a proposed scheduling order and the Court subsequently entered a Scheduling Order which allowed for discovery and depositions (Doc. 55). A two-day evidentiary hearing was conducted on April 7, 2014 and April 8, 2014. Petitioner presented five witnesses, entered four depositions, as well as Dr. Dale G. Watson's affidavit and evaluation, and introduced four notebooks containing numerous exhibits.

Respondent introduced Petitioner's deposition and several exhibits, and relied upon the cross-examination of Petitioner's witnesses.

The primary issue before the undersigned is whether Petitioner is entitled to equitable tolling to excuse the tardiness of his federal habeas petition, which was filed more than two years after the expiration of the one-year limitation period. Petitioner contends he is entitled to equitable tolling because the PCDO abandoned him without notice in his Sevier County federal habeas case.

Respondent opposes the application of equitable tolling in this case, arguing that there was no attorney-client relationship between Petitioner and the PCDO. Further, according to Respondent, Petitioner failed to diligently pursue his rights so the Court need not address whether an extraordinary circumstance stood in Petitioner's way preventing him from timely filing a federal habeas petition. Specifically, Respondent argues that because Petitioner did not particularly inquire about the status of his Sevier County habeas petition when counsel advised him all was going well in his case, he did not diligently pursue his federal habeas rights. Further, Respondent argues that once Petitioner was notified the habeas petition had not been filed, he waited six months before filing the petition, thus again failing to exercise due diligence. Alternatively, Respondent argues that there was no extraordinary circumstance standing in Petitioner's way of filing his habeas, because the PCDO's failure to file the petition was garden-variety negligence.

For the reasons stated herein, it is **RECOMMENDED** that Petitioner is entitled to equitable tolling and his federal habeas petition should be deemed timely and reviewed on the merits.

## II.    RELEVANT FACTS

A hearing was held on the issue of equitable tolling on Monday, April 7, 2014 and Tuesday, April 8, 2014.  Only Petitioner, who was not present at the hearing but testified by deposition, presented witnesses.  Petitioner and Respondent introduced numerous exhibits and depositions, and Respondent cross-examined Petitioner's witnesses.  This case presents some of the most unique, uncommon, and quite frankly, egregious facts of attorney misconduct that this Court has come across.

### A.    Petitioner's Deposition

In his deposition, Petitioner testified that Mr. Delius represented him in his Sevier County post-conviction case, but after the PCDO was appointed to represent him in his Blount County death Penalty case, Mr. Dawson and Ms. Brockenborough became involved in his Sevier County case.  At some point, Petitioner thought that they were appointed to his Sevier County state post-conviction case (Exhibit 21, at 6, 15–17).  Nevertheless, at the conclusion of Petitioner's state post-conviction evidentiary hearing, Attorney Burnette was appointed to represent Petitioner on appeal.

Petitioner explained that at the conclusion of his Sevier County state post-conviction appellate proceedings, he received a letter from Mr. Burnette, informing him that his representation of Petitioner had ended and advising him to call the PCDO to pursue a federal habeas petition (Exhibit 21, at 24).  Petitioner called Ms. Brockenborough and spoke to her about filing a federal habeas petition in his Sevier County case.  According to Petitioner, Ms. Brockenborough told him, "Don't worry about it.  We're not going to leave you lawyerless. They don't let us handle it all ourself [sic] up there.  We'll get you one appointed. . . . Ain't no big deal.  Ain't nothing to worry about. . . . [W]e are not going to leave you lawyerless.  We're

going to get you a lawyer up there to take care of it . . . if we don't handle it all. . . . [W]e may just handle it all" (Exhibit 21, at 25–26). Petitioner explained that based on that conversation, he understood that Ms. Brockenborough was "taking care of it and it was going to be took [sic] care of" (Exhibit 21, at 26).

In describing his relationship with the PCDO, Petitioner explained that in all the years the PCDO represented him—i.e., almost seven years, he probably did not call the office more than fifty times because there was no need to call since someone from the office was usually visiting every week. Petitioner explained that the investigator from the PCDO visited often, and she would assure him that both of his cases were moving along fine, "both of them was [sic] in good hands and there wasn't nothing to worry about" (Exhibit 21, at 37). Petitioner had conversations with the investigator both before and after Ms. Brockenborough left the office (Exhibit 21, at 38). The investigator never gave Petitioner the name of the attorney who would be handling his case after Ms. Brockenborough's departure, but just told him that "they'd appoint someone or they'd handle it theirselves [sic]. And she said, 'we can handle it ourselves.' But she acted like, to me, she wanted somebody up in Knoxville, where they don't have to run back and forth up there to hand stuff from them. That's what she led me to believe" (Exhibit 21, at 38–39). Although Petitioner testified he was fairly happy with Mr. Dawson's representation, he stated that there were times he did have discussions with him "about certain things in the Sevier County case that [Mr. Dawson] wasn't attacking . . . but . . . it wasn't no big deal" (Exhibit 21, at 38).

The last time Ms. Brockenborough visited Petitioner, she told him that she was leaving the PCDO and that she would be starting her own practice. She asked Petitioner if she could keep up with his case, to which he responded that he would be happy for her to do so. Petitioner testified that he understood from this conversation that she wanted "[t]o keep up with [his cases]

and if - - maybe if she seen [sic] something that could be corrected, she could correct it . . ." (Exhibit 21, at 48). On that date, when discussing his case, Ms. Brockenborough did not tell him that the federal habeas petition had not been filed; rather, she told him "everything was looking good and fine . . . everything is fine, nothing to worry about" (Exhibit 21, at 8). At this point, Petitioner did not know what was going on in one case versus the other (Exhibit 21, at 48). Petitioner testified that Ms. Brockenborough "led [him] to believe that [the Sevier County federal habeas petition] would be took [sic] care of in Mr. Dawson's office, there would be someone else put in her place. But [they] didn't know who at the time" (Exhibit 21, at 7–8). Petitioner further explained that Ms. Brockenborough told him that Mr. Dawson would see that it got filed and would appoint another attorney to represent him and take Ms. Brockenborough's place (Exhibit 21, at 8).

After Ms. Brockenborough's departure, Mr. Dawson and the investigator assigned to Petitioner's case, and eventually Ms. Sara Willingham, who was assisting Mr. Dawson, continued to visit Petitioner to discuss the progress of his case (Exhibit 21, at 49). Petitioner explained that when he asked about his cases, it was never a direct "how is my Sevier County case going" or "how is my Blount County case going"; rather, he would generally inquire about his "case" and they would talk about both cases without distinction (Exhibit 21, at 50).

Petitioner explained that he kept up with his case "through the lawyers" (Exhibit 21, at 39). Petitioner thought his attorneys were doing everything that they could on his cases, although he really had no idea what that meant. He stated that he just thought they were "[h]andling legal stuff [but] that [he] didn't know what [it] was" (Exhibit 21, at 51). Petitioner said that he generally did not have to ask counsel about his case because "when they'd come in and sit down, that would be the first thing out, 'Everything is going fine. It's looking good.

6

We're where we need to be.' And so if [he] needed to ask them anything, they'd answer [his] question and then they'd ask [him] questions" (Exhibit 21, at 52). When asked whether he made any independent inquiries outside of what his lawyers were telling him, Petitioner responded: "No, I didn't. . . . And I don't know why I would. I mean, if you can't trust your attorneys, get rid of them. I mean, I believed them. My family believed them" (Exhibit 21, at 40).

After the conclusion of his Blount County state post-conviction proceedings, Petitioner received a notice from the federal court in March 2009, informing him that he needed to pay a $5.00 filing fee. When he called his Federal Defender attorney and asked whether the fee was owed on his Blount County or his Sevier County case, she said it was for his Blount County case. It was at this point that Petitioner first learned that nothing had been filed in his Sevier County case (Exhibit 21, at 34–35). Petitioner testified that he became very angry upon receiving this information. Petitioner stated that he was angry at the PCDO lawyers and the Federal Defender lawyers (Exhibit 21, at 35). Petitioner explained that the reason he did not ask another inmate to help him file a federal habeas petition was "[b]ecause [he] figured it was took [sic] care of and - - and [he] figured that was the reason that lawyers didn't want inmates in their business and filing stuff or messing their cases up and stuff, is what [he had] been told is the reason they don't want inmates doing nothing for inmates" (Exhibit 21, at 53).

**B.      Ms. Brockenborough's Testimony**

Ms. Brockenborough, a Yale graduate and Columbia Law School graduate, was Petitioner's second witness. Ms. Brockenborough was employed at the PCDO when the Post-Conviction Defender, Mr. Dawson, accepted appointment of Petitioner's Blount County death penalty post-conviction case. Although Mr. Dawson assigned Ms. Brockenborough to assist in the case, she eventually ended up taking the role of lead counsel. Ms. Brockenborough became

aware of Petitioner's Sevier County post-conviction case on June 23, 2003, when he called and inquired as to why he was being transported to Sevier County. On June 25, 2003, Ms. Brockenborough met with Mr. Delius, Petitioner's Sevier County post-conviction attorney, before proceeding to the Sevier County Jail to meet with Petitioner.

At the meeting, Petitioner complained about Mr. Delius to Ms. Brockenborough, Mr. Dawson, and the PCDO investigator. Ms. Brockenborough assured Petitioner that Mr. Delius was a good attorney and that the PCDO would be involved in the case and would handle it. In fact, Ms. Brockenborough directed Mr. Delius and he relied on the PCDO to perform most of the work (Doc. 77, at 23–24, 79–80). For example, Ms. Brockenborough prepared the amended post-conviction petition and filed motions before the post-conviction court. Although the parties agree that the judge refused to officially appoint Ms. Brockenborough as co-counsel on the Sevier County case, the Sevier County docket sheet reflects that Ms. Brockenborough was appointed for purposes of arguing the motions she filed on that date—i.e., the motion to consolidate cases, to continue the June 30th hearing, to substitute counsel, and to disqualify the judge from presiding over Petitioner's Sevier County state post-conviction case (Exhibit 30). Ms. Brockenborough also handled the interlocutory appeal of the court's denial of these motions.

Ms. Brockenborough explained that the Blount County and Sevier County cases were intertwined and, as such, they treated the two cases as one, primarily because attacking the Sevier County conviction, the sole aggravating factor in the Blount County death sentence, was key. Therefore, when she had discussions with Petitioner, they talked about both cases as if they were one. When he asked about the status of his case, she interpreted the question as an inquiry about both cases (Doc. 77, at 86–87). Although Ms. Brockenborough was attempting to

represent Petitioner in both is Blount County and Sevier County cases, she was distracted by her own mental illness.

Ms. Brockenborough had struggled with mental health issues since junior high school. These issues culminated into a full-blown mental illness event in December 2006, after the death of her father in September 2006, and her December 2006 notification that she was being terminated from her job effective February 2007 (Doc. 77, at 106–08, 111–14).

C.     **Mr. Dawson's Testimony**

Mr. Dawson was the first Defender appointed to the PCDO. Mr. Dawson testified that he lacked the ability to properly plan his time, was always overwhelmed with his cases, was unable to spend sufficient time on each case, and had to spend twenty to twenty-five percent of his time on administrative duties. Consequently, Ms. Brockenborough, a relatively new attorney, ended up assuming most of the work load on the cases they shared; however, he lacked time to oversee her work (Doc. 77, at 181, 201–02).

Mr. Dawson testified that they assured Petitioner that they were representing him in his Sevier County federal case and told him that they would file the petition or find someone to file it for him. Mr. Dawson explained that because the Sevier County was not a death penalty case, it was not on their case-tracking board, and there was no tickler or deadline set for the case. When Ms. Brockenbrough notified him that the statute of limitations had expired for filing a federal habeas petition, Mr. Dawson cavalierly responded, "oh well" (Doc. 77, at 230).

Mr. Dawson admits that the PCDO should have filed the federal habeas petition, had a duty to file the petition or make sure it was filed, a duty to inform Petitioner of their failure to file it, and a duty to still try and do something about it even after they missed the deadline (Doc. 77, at 233).

### D.      Ms. Brockenborough's Mental Health Experts

The depositions of Ms. Brockenborough's psychiatrist, Dr. Amanda Sparks-Bushnell, and her psychotherapist, Julia Tate, LCSW, are Evidentiary Exhibits Number 19 and 20. Although the testimony is not a cohesive chronological time-line of Ms. Brockenborough's psychological unraveling, the uncontroverted evidence from these two witnesses is that Ms. Brockenborough was struggling to function during the pertinent time period. The testimony of these two experts clearly establish that counsel was suffering from a fairly serious mental illness before she began representing Petitioner, and which progressively escalated into a major health episode sometime at the end of 2006 and continuing into 2007. Although Dr. Sparks-Bushnell initially diagnosed Ms. Brockenborough with a condition known as major depressive disorder in 2001, she ultimately changed that diagnosis in late 2007 to bipolar disorder type II (Exhibit 19, at 87). According to Dr. Sparks-Bushnell, the change in Ms. Brockenborough's diagnosis applied retroactively to when she began her treatment in 2001 (Exhibit 19, at 88). Consequently, during the pertinent time period, Ms. Brockenborough was misdiagnosed. This resulted in Dr. Sparks-Bushnell essentially experimenting with numerous medications, because nothing she prescribed for Ms. Brockenborough was effectively controlling her symptoms or stabilizing her (Exhibit 19, at 20–21).

### E.      Petitioner's Mental Health Experts

Dr. Murray, a Tennessee licensed psychologist, testified that Petitioner suffers from severe intellectual deficits which he has suffered since childhood, and which place him in the mentally retarded range. According to Dr. Murray, in addition to general intellectual deficits, Petitioner also "manifests severe or extreme impairment in specific areas of cognitive

functioning to place him well below what would be expected merely by his low I.Q. that appears to be in the upper end of the mentally retarded range" (Doc. 78, at 86).

Dr. Murray based his professional opinion on his review of the reports of Petitioner's other treating physicians, their underlying data, and his own personal evaluation of Petitioner. Relying on these materials, Dr. Murray concluded that because of Petitioner's intellectual disability, he has an intense dependency on others. Specifically, Dr. Murray testified that Petitioner's disability prevented him from developing the conceptual skills necessary to realize that he had to evaluate his attorneys by their adherence to their professional obligations. Rather, he was only able to pay attention to the superficially friendly aspect of their relationship (Doc. 78, at 95). Dr. Murray also testified that as a result of his intellectual disability and intense dependency, Petitioner was not capable of independently realizing that he should call and check on the status of his case, or that something should have been done (Doc. 78, at 98).

Dr. Greenspan, an expert in the field of intellectual disability, testified that Petitioner meets all three of the standards for intellectual disability based on national clinical standards, as well as in Tennessee. In Tennessee, intellectual disability means:

> (1)    Significantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below;
>
> (2)    Deficits in adaptive behavior; and
>
> (3)    The intellectual disability must have been manifested during the developmental period, or by eighteen (18) years of age.

Tenn. Code Ann. § 39-13-203. According to Dr. Greenspan, Petitioner, in addition to meeting the I.Q. requirement for intellectual disability, also suffered more severe impairments based on broader indices of intellectual limitations (Doc. 78, at 138). Dr. Greenspan testified that this disability manifested itself in Petitioner's gullibility and inability to evaluate social risk;

particularly, "the inability to understand that behaviors that are taken with regard to other people in terms of trusting people who shouldn't be trusted . . . can have huge risks" (Doc. 78, at 138–39).

Additionally, Dr. Greenspan testified that based on Petitioner's I.Q., he is considered to have mild intellectual disability (Doc. 78, at 144). While people with this level of disability do not look obviously impaired, are not globally impaired, and can still function in several areas— for example, maintain employment, get married, or be a parent, they are still severely limited (Doc. 78, at 144–45). Dr. Greenspan concluded that because of his limitations, Petitioner was not capable of assessing his situation critically or independently, particularly considering the complicated nature of the case (Doc. 78, at 146).

The parties stipulated to Dr. Dale G. Watson's evaluation and affidavit in lieu of his testimony at the evidentiary hearing (Exhibits 73–74). Relying on Tennessee's criteria for intellectual disability, Dr. Watson avers that Petitioner suffers from an intellectual disability and did so at the time of his crime (Exhibit 74, at 26). Specifically, in his affidavit, Dr. Watson provides that in his scientific, professional, and expert opinion, which he holds to a reasonable degree of scientific certainty, Petitioner "meets the criteria for an intellectual disability as specified in the Tennessee Code Annotated 39-13-203 and *Coleman v. State*, [341 S.W.3d 221 (Tenn. 2011),] as well as the clinical diagnostic criterion put forth by the American Psychological Association (APA) and the American Association on Intellectual and Developmental Disabilities (AAIDD)" (Exhibit 74, at 26–27).

In his evaluation, Dr. Watson explained that Petitioner's full scale I.Q. ("FSIQ") was 69, placing him in the second percentile rank of the population and "[w]ith a 95% degree of confidence[,] Mr. Dellinger's WAIS-IV FSIQ can be said to fall within the range of 66 to 74"

(Exhibit 73, at 16). Dr. Watson further explained that Petitioner rated borderline and extremely low on each item of his profile of intellectual functioning (Exhibit 73, at 17). Additionally, Petitioner's intellectual abilities are limited—falling at about the second percentile rank, which "meets the criteria for the first prong of the diagnosis of Mental Retardation, i.e., significant deficits in intellectual abilities" (Exhibit 73, at 18). Dr. Watson concluded that Petitioner "has significant limitations in intellectual functioning, consistent with a diagnosis of Intellectual Disability (Mental Retardation)" (Exhibit 73, at 16).

Dr. Watson also concluded that Petitioner's test scores demonstrated that he "has a profound inability to pronounce words, to spell[,] and to comprehend written language. . . . These results demonstrate that he has a profound dyslexia (alexia), is illiterate[,] and cannot understand virtually any written materials. This finding clearly demonstrates an area of impaired functioning in the domain of functional academic skills" (Exhibit 73, at 19).

Based on the results of a comprehensive neuropsychological examination, a clinical review of Petitioner, and a review of the available records, it is Dr. Watson's opinion that Petitioner demonstrated clear and convincing evidence of significant brain dysfunction impacting his overall intellectual capacity, his capacity to attend, his memory abilities, executive functions, his ability to problem solve, and his ability to perform essentially any academic task be it reading, spelling, or arithmetic (Exhibit 73, at 29).

Finally, and significant to the equitable tolling issue, Dr. Watson concluded that Petitioner's deficits precluded him from acting on his own to represent his own interests in court and "made him entirely dependent upon counsel to represent adequately his interest" (Exhibit 73, at 31).

13

## III.    ANALYSIS

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") establishes a one-year statute of limitations for state inmates seeking federal habeas corpus relief. It is uncontested that Petitioner did not seek federal habeas relief until September 11, 2009, more than two years after his federal limitations period had expired, and approximately six months after notification that a federal habeas petition had never been filed. Accordingly, the federal habeas petition, filed as of September 11, 2009, is clearly outside the one-year statute of limitations and should be dismissed as time-barred absent equitable tolling.

Petitioner, however, contends that he is entitled to equitable tolling based on the assurances by the PCDO that a federal habeas petition would be filed on his behalf in his Sevier County case. Petitioner, who is illiterate and intellectually impaired, relied on those assurances by his mentally unhealthy attorney and the PCDO, to his detriment.[1] Although Petitioner was assured that his Sevier County federal habeas petition would be handled, his mentally unstable attorney and her boss, Mr. Dawson, failed to follow through on those assurances. Specifically, no federal habeas petition was filed on his behalf in this case. Even more egregious than their failure to timely file a federal habeas petition was the PCDO's concealment of the omission, and failure to attempt to remedy the situation. Instead, the PCDO abandoned Petitioner and his federal rights in relation to his Sevier County case without ever notifying him of their omission and abandonment.

---

[1] The Court does not conclude here that Petitioner does, in fact, meet the definition of mental retardation under Tenn. Code Ann. § 39-13-203, nor does the Court address the question of whether Petitioner's mental impairment is a sufficient ground, standing alone, to constitute an extraordinary circumstance warranting equitable tolling. Nevertheless, the undersigned is convinced that Petitioner's mental limitations is a relevant factor in determining his perception of the existence of an attorney-client relationship, and the issue of due diligence.

## A.    Law Concerning Equitable Tolling

The one-year statute of limitations under AEDPA may be subject to equitable tolling under appropriate circumstances. *See Holland v. Florida*, 460 U.S. 631, 645 (2010). However, "[e]quitable tolling is granted sparingly and is evaluated on a case-by-case basis, with the Petitioner retaining the ultimate burden of persuading the court that he or she is entitled to equitable tolling." *Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 462 (6th Cir. 2012) (internal citation and quotation marks omitted); *see also Holland*, 560 U.S. at 649–50 (quoting *Baggett v. Bullitt*, 377 U.S. 360, 375 (1964)) ("[T]he 'exercise of a court's equity powers must be made on a case-by-case basis."). To be entitled to equitable tolling, a petitioner must show: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Lawrence v. Florida*, 549 U.S. 327, 336 (2007) (citation and internal quotation marks omitted). Whether equitable tolling is warranted is a fact-intensive inquiry. *See Holland*, 560 U.S. at 654.

In *Holland*, the Supreme Court held that egregious cases of an attorney failing to satisfy professional standards of care may constitute the extraordinary circumstance required to allow equitable tolling. *See id.* at 679. It is well settled that "a garden variety claim of excusable neglect, such as a simple 'miscalculation' that leads a lawyer to miss a filing deadline, does not warrant equitable tolling." *Id.* at 651–52 (citations omitted). However, more serious cases of misconduct such as abandonment, *see Maples v. Thomas*, 132 S. Ct. 912, 923 (2012), or attorney mental incapacity, *see Robertson v. Simpson*, 624 F.3d 781, 785 (6th Cir. 2010), may constitute extraordinary circumstances. In this case, the Court finds both such examples of serious misconduct and extraordinary circumstances exist.

15

In a case of abandonment, "a client [cannot] be faulted for failing to act on his behalf when he lacks reason to believe his attorneys of record, in fact, are not representing him." *Maples*, 132 S. Ct. at 924. Although *Maples* concerned a habeas case involving the default of claims, it is instructive in equitable tolling cases as the court indicated that the "extraordinary circumstances" necessary to supply cause for a procedural default are similar to what is required to establish a petitioner's entitlement to equitable tolling. *Id*. at 923 n.7.

Alternatively, a petitioner may establish the extraordinary circumstances allowing equitable tolling by showing attorney incompetence due to mental illness. *See Robertson*, 624 F.3d at 782. When a petitioner seeks to prove that the metal incompetence of his attorney is sufficient to constitute an extraordinary circumstance, he must demonstrate that counsel's mental illness affected his ability to file a timely habeas petition. *Id*.

In addition to proving the existence of an extraordinary circumstance, a petitioner seeking equitable relief must prove that he diligently pursued his rights. *See Lawrence*, 549 U.S. at 336. Due diligence does not require "maximum feasible diligence"; rather, "[t]he diligence required for equitable tolling purposes is reasonable diligence." *Holland*, 560 U.S. at 653 (internal citations and quotation marks omitted). "Under long-established principles, petitioner's lack of diligence precludes equity's operation." *Pace v. DiGuglielmo*, 544 U.S. 408, 419 (2005); *see also Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 151 (1984) ("One who fails to act diligently cannot invoke equitable principles to excuse that lack of diligence."). The Sixth Circuit, consistent with the Supreme Court, has held that petitioners who "passively await decision[s]" of a court may not seek equitable tolling. *Robinson v. Easterling*, 424 F. App'x 439, 443 (6th Cir. 2011). However, the Sixth Circuit has found reasonable diligence where the petitioner received attorney assurance, *see Granger v. Hurt*, 90 F. App'x 97, 100 (6th Cir. 2004),

and where petitioner's delay in inquiring about the status of his case was reasonable given the court's long delay on previous motions. *See Miller v. Collins*, 305 F.3d 491, 496 (6th Cir. 2002).

**B.      The Issues**

The three specific issues referred to the undersigned are: (1) whether an attorney-client relationship existed; (2) whether Ms. Brockenborough's mental illness and the alleged abandonment by his attorneys and the PCDO constitute an extraordinary circumstance; and (3) whether Petitioner diligently pursued his federal habeas remedies in his Sevier County case.

1.      *Attorney-Client Relationship*

Respondent contends that Petitioner did not have an attorney-client relationship with the PCDO in his Sevier County case, but rather, they were merely informal advisors to him in that case (Doc. 36, at 8–11). Petitioner disagrees.

a.      Background

A brief summary of the procedural history of Petitioner's Sevier County state post-conviction proceedings is necessary to put Petitioner's relationship with the PCDO into context. On October 24, 1996, Petitioner filed a *pro se* state post-conviction petition in Sevier County with help from an inmate (Exhibit 24). On November 15, 1996, Attorney Bryan Delius was appointed to represent Petitioner in his Sevier County post-conviction case (Exhibit 25). Mr. Delius notified Petitioner of this appointment by letter, but never visited Petitioner. Approximately two years after Mr. Delius sent Petitioner the notification letter of his appointment, a letter was sent to the post-conviction judge on Petitioner's behalf complaining that Mr. Delius had failed to pursue his case (Exhibit 21, at 42–43).

In actuality, the case was at a stalemate because the state record was tied up in Petitioner's Blount County case and, as such, unavailable to counsel; however, this was not

clearly conveyed to Petitioner.  In Petitioner's letter to the judge, he requested that Mr. Delius be removed from his case (Exhibit 26).  Petitioner was transported to Sevier County court for a hearing in July 1999, following his letter to the judge (Doc. 77, at 15).  It was at this hearing that Petitioner met Mr. Delius for the first time.  According to Petitioner, Judge Ogle told him that Mr. Delius was his attorney whether he wanted him or not, that he was Mr. Delius's client whether he wanted to be or not, and that since he did not hire him, he could not fire him.  The judge further instructed Petitioner to listen to his attorney and do what his attorney said (Exhibit 21, at 43).

Several years later, on July 16, 2002, direct review of Petitioner's Blount County death Penalty case ended when the United States Supreme Court denied certiorari.  *See Dellinger v. Tennessee*, 537 U.S. 1090 (2002).  At the conclusion of those proceedings, Mr. Dawson, on behalf of the PCDO, accepted appointment to represent Petitioner in his Blount County state post-conviction case.  Mr. Dawson appointed himself and Ms. Brockenborough to handle the case.  The PCDO attorneys determined that because Petitioner's sentence of death was dependent on his conviction in Sevier County as the sole aggravating factor, the two cases were related and, as such, treated them as one case from the outset (Doc. 77, at 72).

At Petitioner's Sevier County hearing in June 2003, the state court declined to formally appoint the PCDO as co-counsel on Petitioner's Sevier County post-conviction case.  Regardless, the Sevier County docket sheet reflects that Ms. Brockenborough was appointed for the purpose of arguing motions on June 30, 2003, and she ultimately handled the interlocutory appeal of those motions (Exhibit 30).  Additionally, while not determinative of the attorney-client relationship at issue, the Court notes that the appellate court lists Ms. Brockenborough as one of

Petitioner's counsel at his post-conviction hearing. *See Dellinger v. State*, No. E2004-01068-CCA-R3-PC, 2006WL 1679595 (Tenn. Crim. App. June 19, 2006).

In Petitioner's understanding, when Ms. Brockenborough and the PCDO investigator visited him in Sevier County, Ms. Brockenborough went to court with him; while in court, Ms. Brockenborough spoke to the judge on his behalf, and was present every time he appeared in court in his Sevier County post-conviction case, with the exception of his 1996 appearance before Judge Ogle (Exhibit 21, at 44–45). Petitioner describes the conclusion of his Sevier County post-conviction hearing as follows:

> Bryan Delirious [sic] give me to another lawyer that was down on the end, that I'd never seen before. But he said he wanted off the case, so he gave me to him. And the lawyer leaned out like that (indicating), and I spoke to him. And the judge asked me, said 'Do you have any objection?' and I told him, "I have no idea what's going on.' And that's when Mr. Dawson stepped up and said he wanted to both cases and stuff. And the judge give me to him and - - but let him stay on to help in Knoxville.

(Exhibit 21, at 46). This appears to be a misunderstanding on Petitioner's part as the Court has not found any evidence supporting Petitioner's understanding of what happened. Nevertheless, the only attorneys Petitioner had personal contact with regarding his Sevier County case, were the ones from the PCDO.

Petitioner never formally met Mr. Richard L. Burnette, who was appointed to handle his post-conviction appellate case, and never discussed the case with Mr. Burnette. In fact, the only communication Petitioner had with Mr. Burnette was the letter notifying Petitioner that his Sevier County appellate post-conviction relief had been denied (Exhibit 21, at 46–47). Specifically, when Petitioner's Sevier County state post-conviction appeal was denied and his application for permission to appeal was denied by the Tennessee Supreme Court, Petitioner received a letter from Mr. Burnette advising him that his state post-conviction case was over, and

19

suggesting that he contact the PCDO concerning relief in the federal system (Exhibit 15).[2] Petitioner had an inmate read him the letter and then called Ms. Brockenborough, who advised him that the PCDO would file a federal habeas petition on his behalf, or find someone to do so (Doc. 77, at 110).

Petitioner explained that when the PCDO talked to him about his cases, both cases were treated together. They would discuss the Blount County case and then the Sevier County cases and how they were intertwined and included the same evidence. For example, when they talked about the investigation of Ms. Branam's death, it could have been in reference to either the Sevier County or Blount County case (Exhibit 21, at 47). According to Petitioner, at no time did the PCDO tell him that they couldn't do something because it concerned the Sevier County case as opposed to the Blount County case (Exhibit 21, at 48). Perhaps most important here is the fact that the PCDO attorneys were the only attorneys discussing the Sevier County case with Petitioner.

Significantly, both Ms. Brockenborough and Mr. Dawson believed that they had a professional duty to monitor and assist in the Sevier County case, and they explained that duty to Petitioner. Indeed, counsel explained that the Blount County and Sevier County cases were intertwined and intrinsically related, and led Petitioner to believe that it was their duty to handle both cases. Thus began the "culture of reliance" where the PCDO believed, and lulled Petitioner into believing, that although they were not officially appointed as counsel on his Sevier County case, it was their case and they were treating it as their case. *See, e.g., Ragan v. Horn*, 538 F. Supp. 2d 906, 912 (E.D. Pa. 2008) (concluding that an inquiry of the status of a federal habeas petition made less than five months after counsel had been retained was reasonably diligent

_____

[2] It is important to note that the correspondence indicates that Mr. Burnette also sent a copy of the letter to Ms. Brockenborough.

based on a "culture of reliance" created by counsel). From Petitioner's view point, the PCDO were the only attorneys really working on his Sevier County case, as they were the only ones who ever discussed the case with him.

b.     Applicable Law

In determining whether an attorney-client relationship exists, "the focus is on the *client's* subjective belief that he is consulting a lawyer in the lawyer's professional capacity and his intent is to seek professional legal advice." *Grace v. Ctr. for Auto Safety*, 72 F.3d 1236, 1242 (6th Cir. 1996) (citation and internal quotation marks omitted); *see also Thompson v. Karr*, No. 98-3544, 1999 WL 519297, at *5 (6th Cir. July 15, 1999) ("The test [for determining whether an attorney-client relationship exists] is essentially whether the putative client reasonably believed that the relationship existed and that the attorney would therefore advance the interests of the putative client.") (citation and internal quotation marks omitted).

c.     Discussion

Respondent claims that the PCDO was no more than an informal advisor to Petitioner and, as such, their actions cannot form the basis for equitable tolling. Respondent makes two major arguments in support of this contention. First, Respondent argues that the PCDO was not officially appointed to represent Petitioner in his Sevier County case. Secondly, Respondent asserts that the PCDO was statutorily prohibited from representing Petitioner in this case. Alternatively, Respondent appears to argue that Petitioner's reliance on the PCDO to file his Sevier County federal habeas petition was not reasonable because the PCDO did not specifically promise Petitioner that they would file his petition. While Respondent raises important considerations, they are not determinative of the existence of an attorney-client relationship.

21

Pursuant to the applicable law, the Court considered several factors in determining whether an attorney-client relationship existed as to Petitioner's Sevier County case. First, an attorney-client relationship between Petitioner and the PCDO clearly existed with respect to the Blount County case in which they were appointed to, and did, represent Petitioner. The PCDO attorneys were his attorneys and he had an attorney-client relationship with them. This is undisputed. Second, the uncontradicted evidence demonstrates that Petitioner called the PCDO specifically seeking representation to pursue a federal habeas petition in his Sevier County case. Petitioner undoubtedly believed he was consulting Ms. Brockenborough in her official capacity as his attorney regarding his Sevier County case and pursuing his federal habeas rights (*See* Exhibit 21).

Third, the evidence shows that Ms. Brockenborough assured Petitioner on the phone that the PCDO would ensure that a federal habeas petition was filed in his Sevier County case (*See* Exhibit 21, at 25–26; Doc. 77, at 109–10). Particularly, Ms. Brockenborough testified that she told Petitioner that their "office would sort of oversee th[e] process, either handling the case [themselves] or being involved in finding another lawyer and working with that person" (Doc. 77, at 110). Mr. Dawson further corroborated the assurances made to Petitioner, testifying that "it's clear to [him] that [either he or Catherine, or both of them] told – assured [Petitioner] that [they] would find counsel for him to file the habeas corpus in Sevier County, and if [they] didn't find it [sic], [they] would file it" (Doc. 77, at 227).

Fourth, Petitioner unquestionably relied on the representations made by the PCDO that a federal habeas would be filed in his Sevier County case. Petitioner testified that he believed the PCDO was handing his Sevier County federal habeas petition because they said that they would, and they never notified him otherwise. According to Petitioner, he didn't ask someone in the

prison to draft a federal habeas petition for him because he figured it had been taken care of (Exhibit 21, at 53). More importantly, counsel testified that they knew Petitioner was relying on them to have a federal habeas petition filed in his Sevier County case, and that they intended to make sure a petition was filed, but they dropped the ball (*See* Doc. 78, at 73) ("He trusted us to do what we did . . . he would have no reason to believe that we hadn't followed through what we told him we would do."). Under the circumstances, Petitioner's reliance was reasonable. That the PCDO not only never declined nor discouraged his reasonable belief, but rather, accepted his request, and encouraged his belief, only makes his reliance more reasonable.

While the PCDO was not officially appointed to Petitioner's Sevier County case, and was, in fact, statutorily estopped from handling the case, it remains clear that they were the only ones discussing the Sevier County case with Petitioner. Petitioner's illiteracy and mental deficiencies prevented him from understanding and appreciating the formal legal subtle distinction present here, especially in light of the attorney-client relationship that already existed between him and the PCDO in relation to his admittedly intertwined Blount County case. The fact remains that Petitioner has been entangled in a legal maze of numerous attorneys representing him in two intertwined cases, a situation that would be confusing even to a person of normal functioning capabilities.[3] Additionally, because of the direct connection between the two cases, success in the Sevier County case would directly affect the Blount County case, thus making both cases part of a single representation—and attorney-client relationship. Any legal difference in the two representations would be a difference without a distinction to an objectively reasonable person.

---

[3] In Sevier County, Petitioner had Ed Miller, Suzanna Laws, and Thomas Webb as attorneys at trial and on direct appeal; Bryan Delius on post-conviction with the PCDO assisting, although not officially appointed; and Richard Burnette on post-conviction appeal. Somewhat simultaneously in Blount County, Petitioner was represented by Eugene Dixon and Charles Deas at trial and direct appeal, and the PCDO on post-conviction and post-conviction appeal.

To the extent that Respondent argues that the PCDO was statutorily prohibited from representing Petitioner in his Sevier County federal habeas case, the Court finds that Respondent conflates the PCDO's duty to make sure the petition was filed and the PCDO's inability to actually *handle* the case. Indeed, Mr. Dawson addresses this question directly, stating:

> I think you're conflating filing and handling. It is clear that we could not continue to represent – we could not file and represent [Petitioner] in his Sevier County federal habeas. That was not within our statutory authority. . . . But that's not to say that we didn't have and I didn't understand that we had the ethical responsibility to make sure that it was filed, including filing it ourselves, if that was necessary

(Doc. 77, at 35). The Court agrees. A greater indication of the nature of the relationship between Petitioner and the PCDO is the fact that Ms. Brockenborough, on behalf of the PCDO, explicitly undertook to perform the specific task of filing a federal habeas petition on Petitioner's behalf or of making sure one was filed.

For the above stated reasons, the Court concludes that Petitioner and the PCDO were engaged in an attorney-client relationship in relation to his Sevier County case, and the undertaking of filing a federal habeas petition in that case.

2. *Extraordinary Circumstance*

Although Ms. Brockenborough's mental illness and miscalculation of the statute of limitations contributed to the PCDO's failure to file a federal petition in the Sevier County case and constituted an extraordinary circumstance,[4] ultimately, for the reasons explained below, the

---

[4] It goes without saying that Ms. Brockenborough's handling of Petitioner's case while severely mentally impaired, as well as Mr. Dawson's failure to supervise her or inform Petitioner of her limitations, was egregious and unprofessional. While neither Mr. Dawson or Ms. Brockenborough were able to recall the specific date she attempted to calculate the deadline to file Petitioner's federal habeas petition, the testimony of Dr. Sparks-Bushnell and Julia Tate clearly establish that Ms. Brockenborough was falling apart psychologically and professionally during the time period she could have possible calculated or filed Petitioner's federal habeas petition (*See* Exhibits 19, 20). These uncontradicted facts lead the Court to conclude that Ms.

primary extraordinary circumstance in this case, and relied upon herein, is counsel's abandonment of Petitioner's Sevier County case without notice.

a.    Applicable Law

As previously noted, "[a] 'petitioner' is 'entitled to equitable tolling' only if he shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way,' and prevented timely filing." *Holland*, 560 U.S. at 649 (citation omitted). Because an attorney is the client's agent, a federal habeas petitioner, who has no constitutional right to counsel, is normally bound by his attorney's errors, including a miscalculation of the filing deadline. *Lawrence*, 549 U.S. at 336–37 ("Attorney miscalculation is simply not sufficient to warrant equitable tolling, particularly in the postconviction context where prisoners have no constitutional right to counsel."). However, an attorney who abandons his client without notice "severs the principal-agent relationship," at which time counsel's acts or omissions are no longer fairly attributable to the client. *Maples*, 132 S. Ct. at 922–23. In other words, a client cannot be held responsible for the acts and omissions of an attorney who has abandoned him. *Id.* at 923–24.

b.    Discussion

The record indicates that at some point during her representation of Petitioner, Ms. Brockenborough attempted to calculate the deadline for filing Petitioner's Sevier County federal habeas petition, and based on her calculation, deduced that the deadline had passed. After Ms. Brockenborough decided that she had missed the deadline, she informed Mr. Dawson. Remarkably, neither attorney discussed it further, recalculated the statute of limitations, or notified Petitioner of their failure. Notably, after missing the filing deadline, Mr. Dawson and

Brockenborough's mental illness was indeed the cause of her failure to file Petitioner's federal habeas petition in a timely manner. This certainly constitutes the extraordinary circumstance required for equitable tolling.

the PCDO continued to represent Petitioner in the same manner as they always had, assuring Petitioner that everything was fine (Doc. 78, at 71–72). According to Mr. Dawson, while they were not "giving [Petitioner] a rosy picture that everything was wonderful[,]" they were giving him status reports that he could understand, telling him that they thought he had good and serious issues that they were still representing (Doc. 78, at 71). However, at no point during this period did the PCDO specifically inform Petitioner that they had blown the statute of limitations on his Sevier County federal habeas petition, and that the case, in fact, was not moving forward (Doc. 78, at 72). Instead, although they were, in their sole understanding, only continuing representation in Petitioner's Blount County case, their conversations with Petitioner continued as if they were still representing him in both cases. Thus, Petitioner had no clue that counsel had abandoned his Sevier County federal habeas case, and no reason to believe such had occurred.

In sum, counsel, unbeknownst to Petitioner, abandoned him unilaterally and without notice, but with concealment, and thereby "severed the principal-agent relationship" in the Sevier County case, which caused the default. *See Maples*, 132 S. Ct. at 924 (concluding that a client cannot be liable for acts or omissions of an attorney who has abandoned him and cannot be faulted for failing to act when he lacks reason to know attorneys are not representing him).

Thus, aside from Ms. Brockenborough's mental illness, an extraordinary circumstance in its own right, Petitioner has clearly demonstrated that his attorneys abandoned him in relation to his Sevier County federal habeas filing without notice, once they concluded that the filing deadline had expired. Counsel for Petitioner conceded, and Petitioner agreed, that counsel never indicated that they had not filed a federal habeas petition in his Sevier County case, as they concealed their failure and never informed him that they were no longer working on his Sevier County case.

In other words, counsel acted in a manner completely adverse to Petitioner's interest when after agreeing to pursue a federal habeas case on Petitioner's behalf, they failed to provide the service by letting the statute of limitations expire without filing the petition, and by further neglecting to notify Petitioner of their failure to file. At that time, counsel ceased acting in Petitioner's best interest. PCDO's actions, or inaction, as is the case here, severed the principal-agent relationship without notice, thus abandoning Petitioner and concealing their shortcomings in relation to his Sevier County federal habeas petition.

Accordingly, the undersigned finds that the PCDO's abandonment of Petitioner's Sevier County federal habeas without notice provides the extraordinary circumstance for equitable tolling. Specifically, counsel's abandonment caused Petitioner to fail to meet the AEDPA filing deadline, thus meeting one of the criteria for equitable tolling of the § 2244(d) statute of limitations period.

3.     *Due Diligence*

Petitioner, an illiterate and intellectually impaired inmate, claims he diligently pursued his rights to the extent he was reasonably able under the circumstances. Petitioner testified that he relied on counsel's assurances that a federal habeas petition would be filed in his Sevier County case, and he had no reason to believe that they had not done so. Petitioner argues that based on the "culture of reliance" created by Ms. Brockenborough and the PCDO, and his lack of knowledge of federal habeas litigation, compounded by his illiteracy, brain damage, and mental impairment, he was unable to question the PCDO's handling of his federal habeas petition (Doc. 29, at 18). Petitioner further claims that his cognitive limitations prevented him from appreciating any need to further supervise or monitor counsel and his federal habeas proceedings. Therefore, according to Petitioner, he acted as diligently as possible under his

specific circumstances. Petitioner claims that "in light of his limitations," all he "was capable of doing was putting blind faith in [the] PCDO" (Doc. 29, at 20).

Respondent argues that Petitioner failed to exercise due diligence as he never specifically inquired about whether the Sevier County federal habeas petition had been filed, or specifically inquired about the status of the Sevier County federal habeas case. In addition, according to Respondent, Petitioner was not diligent in the pursuit of his federal habeas rights as he waited an additional six months after learning that a federal habeas had not been filed in his Sevier County case.

a.    Applicable Law

As previously noted, the standard for due diligence is not "maximum feasible diligence," but rather, "[t]he diligence required for equitable tolling is reasonable diligence." *Holland*, 560 U.S. at 653 (internal citations and quotation marks omitted); *see also Robinson*, 424 F. App'x at 443 (same). Although the Court's research has not revealed Sixth Circuit jurisprudence that specifically identifies the factors a court should consider when analyzing a prisoner's due diligence, it appears that the Second Circuit has one of the most well-developed and articulated standards for evaluating due diligence in the context of equitable tolling in a habeas case. *See Baldayaque v. United States*, 338 F.3d 145 (2d Cir. 2003). The Second Circuit instructs that the question that should be asked is: "did the petitioner act as diligently as reasonably could have been expected *under the circumstances*?" *Id*. at 153.

The circumstances that the court in *Baldayaque* took into consideration include: (1) petitioner's efforts at the earliest possible time to secure counsel for the purposes of filing a habeas petition; (2) petitioner's lack of funds to consult another lawyer; (3) counsel's assurances that everything had been done that could be done; (4) counsel's failure to communicate directly

with petitioner at any time; (5) petitioner's lack of education and inability to speak or write English; and (6) petitioner's incarceration and lack of direct access to other forms of legal assistance. *Id*. Also instructive to the due diligence issue is the Supreme Court's directive in *Maples* that when counsel abandons a client without notice, the "client [cannot] be faulted for failing to act on his own behalf when he lacks reason to believe his attorneys of record, in fact, are not representing him." 132 S. Ct. at 923.

b.    <u>Discussion</u>

Petitioner asserts that he is entitled to equitable tolling because counsel misled him into believing that they were pursuing federal habeas relief on his behalf in his Sevier County case, but had, instead, abandoned him in that regard without notice, and concealed their abandonment. Respondent argues that Petitioner did not pursue his federal habeas rights diligently because he never specifically asked whether a federal habeas petition had been filed in his Sevier County case.

While it is established that the due diligence inquiry is a reasonable person inquiry, *see Holland*, 560 U.S. at 653, Respondent seemingly argues that reasonable diligence is an objective standard that does not take into account the specific characteristics of a petitioner or the given circumstances. Petitioner, on the other hand, argues that the standard is subjective, and should take into account Petitioner's individual limitations. Alternatively, Petitioner argues—correctly, as it appears to the Court—that even under an objectively reasonable standard, Petitioner was diligent because it takes into account the circumstances of the case. The Court finds that Respondent is mistaken in part, as the standard for determining due diligence is based on the given circumstances, which necessarily includes Petitioner's illiteracy, intellectual capacity, the

29

culture of reliance created by the PCDO, and ultimately, the abandonment without notice by counsel.

Initially, the Court observes that all of the applicable *Baldayaque* factors weigh in Petitioner's favor here: (1) he expeditiously secured counsel to file the Sevier County federal habeas petition as soon as he was notified that his state post-conviction proceedings had concluded; (2) he was in contact with a representative of the PCDO every few weeks and inquired about the status of his cases, and was assured everything was proceeding; and (3) in light of his illiteracy, intellectual impairment, the "culture of reliance" created by the PCDO, and the frequency and nature of the attorney-client communications, there was no reason for Petitioner—or even any ordinary reasonable client—to believe that he should have sought new counsel in relation to his Sevier County federal habeas petition.

Respondent faults Petitioner for never specifically asking the PCDO if his federal habeas petition was filed. Based on the specific circumstances of this case and the relationship cultivated by the PCDO, it does not appear Petitioner knew, should have known, or even been expected to ask such questions. This is so because no one advised Petitioner of the applicable statute of limitations, the time-period available to file the petition, or even what was needed to file the petition (*See* Doc. 77, at 132–33). This information was not provided to Petitioner because counsel assessed that he was intellectually unable to understand the significance of such information. Therefore, Petitioner did not know there was a statute of limitations or deadline, let alone that the statute of limitations was close to expiring. Petitioner simply did not have the knowledge or the intellectual ability to inquire whether a federal habeas petition was timely filed. Notably, the calculation of the statute of limitations in cases such as Petitioner's is a fairly complicated calculation, one which skilled legal counsel in this case actually got wrong.

Even further, the Court notes that it was not unreasonable that Petitioner did not inquire about the status of his case in the two years between the end of his Sevier County state post-conviction case and when he learned the federal habeas petition had not been filed. As the Sixth Circuit has noted, "[f]rom a litigant's perspective, it is a difficult, if not impossible, endeavor, to estimate how long a reviewing court will take to decide a particular motion." *Miller*, 305 F.3d at 491. This is especially applicable to Petitioner whose cases have had a history of taking numerous years to complete. For instance, Petitioner's Sevier County post-conviction case remained idle from 1996 to 2003, and more importantly, when Petitioner attempted to question his lawyer in that case, he was essentially told to sit back and trust his lawyer.

Additionally, since counsel assured Petitioner that they would handle his federal habeas petition and they never told him anything to the contrary, it would be reasonable for almost any client to rely on counsel's representations under these circumstances. This is even more probable for someone like Petitioner, who is illiterate, intellectually impaired, and has been diagnosed with extreme dependency issues. In *Granger*, the Sixth Circuit found that the petitioner's delay in inquiring about the status of his case was reasonable because the petitioner had reason to believe that his family had discussed an appeal with his attorney, and that his attorney was filing the appeal. 90 F. App'x at 100. A similar and, perhaps, stronger argument can be made in Petitioner's case. He received assurances from the PCDO that a federal habeas petition would be filed on his behalf. Both Petitioner and counsel have described these repeated assurances that lulled Petitioner into inaction. In this case, due diligence simply did not require Petitioner to specifically inquire about the PCDO's pursuit of his Sevier County federal habeas.

It is clear that Petitioner never had a reason to believe that his attorneys were, in fact, not representing him. Through no fault of his own, Petitioner lacked the assistance of any attorney

to timely pursue his federal habeas petition, and had no reason to believe that the PCDO was not handling his Sevier County case. To be clear, Petitioner's initial reason to believe his attorneys were, in fact, not representing him in his Sevier County case was not until March 2009 when his federal defenders notified him. Here, similar to *Maples*, Petitioner was abandoned by counsel and left unrepresented at a critical time for his federal habeas petition. Even worse, Petitioner lacked any clue of the need to protect himself *pro se*. As the *Maples* Court states, "[i]n these circumstances, no just system would lay the [tardy filing] at [Petitioner's] death-cell door." *Id.* at 917. Indeed, the undersigned cannot imagine anything less just, under all the circumstances, than to effectively consign Petitioner to die, rather than simply allow his petition to be deemed timely filed. He was abandoned by his lawyers; he should not be abandoned by the courts.

Pursuant to the equitable principles of *Maples* and *Holland*, and the Court's conclusion that Petitioner was abandoned by counsel without notice, the undersigned concludes that Petitioner lacked any reason to believe that the PCDO were not representing him and, therefore, under the circumstances, he pursued his federal habeas rights in his Sevier County case with reasonable due diligence.

## IV. CONCLUSION

Based on the interests of justice and in view of the extraordinary circumstances and high stakes involved, combined with the absence of any fault on Petitioner's part, it is **RECOMMENDED**[5] that equitable tolling be applied in this case.

Respectfully submitted,

_____ s/ C. Clifford Shirley, Jr. _____
United States Magistrate Judge

---

[5] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Civ. P. 72(b)(2). Such objections must conform to the requirements of Rule 72(b), Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985). The district court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive or general. Mira v. Marshall, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370 (6th Cir. 1987).