IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
NORTHERN DIVISION

| | | |
|---|---|---|
| JAMES **DELLINGER**, | ) | |
| | ) | |
| Petitioner, | ) | No. 3:09-CV-404 |
| | ) | |
| vs. | ) | Judge Varlan |
| | ) | |
| RICKY **BELL**, Warden, Riverbend | ) | |
| Maximum Security Institution | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
RENEWED MOTION FOR DISCOVERY IN LIGHT OF NEW EVIDENCE**

This Memorandum of Law is submitted in support of the contemporaneously filed Renewed Motion for Discovery in Light of New Evidence.

## I.    Factual and Procedural Background

This case involves Mr. Dellinger's Sevier County trial for first degree murder, and the resulting verdict, which became the predicate for imposition of the death penalty in Mr. Dellinger's related Blount County case (which is before this court as case 3:09-cv-104).   Both trials involved largely the same proof, with evidence regarding the murder of Tommy Griffin in Blount County, being used to prove the murder of Connie Branum on Sevier County, and vice versa.   *Compare facts from State v. Dellinger*, 79 S.W.3d 458, 462-466 (Tenn. 2002) (murder of Tommy Griffin) with *State v. Gary Sutton and James Dellinger*, 1995 WL 406953, at *1-3

1

(Tenn.Crim.App. July 11, 1995) (murder of Connie Branum).

Since appointment, undersigned counsel has attempted to investigate the events which led to the deaths of Connie Branam (in this case), and Ms. Brannam's brother, Tommy Griffin, days earlier (in case 104). As no adequate explanation for why Mr. Dellinger would have killed his friend Tommy Griffin has ever been provided, Dellinger counsel specifically looked at alternative suspects—as had prior counsel.[1] Major litigation has involved around *Brady* claims, and the failure of the prosecution to disclose other potential killers who had a specific motive to wish harm upon the deceased, and who had the temporal opportunity to commit the crime. An alternative suspect, identified in earlier *Brady* litigation, was a man by the name of Lester "Festus" Johnson (now deceased), whose potential role was described by the Tennessee Court of Criminal Appeals:

> [Trial counsel] said that he did not see a memorandum dictated by Chief Detective Dale Gourley of the Blount County Sheriff's Department prior to trial. The memorandum was dated March 4, 1992, and reflected the substance of a telephone call that Detective Gourley received from Agent Sam Gregory, with the North Carolina State Bureau of Investigation. The memorandum described an offense in North Carolina involving Lester Johnson and Christina Hartman, the victim in that case. According to the memorandum, Ms. Hartman witnessed Lester Johnson's cousin slash Mike Vaughn's throat at a "biker party" in Sevier County, Tennessee. Ms. Hartman herself was later the victim of an attack by Lester Johnson at a "biker rally" in Cherokee, North Carolina. Ms. Hartman refused Mr. Johnson's attempts to force her to engage in a sexual act, and he cut her throat. Mr. Johnson was arrested and tried in North Carolina for attempted first degree sexual offense. Ms. Hartman

---

[1] Somewhat circularly the murder of Tommy Griffin was used by the prosecution to provide a motive for killing his sister, Connie Branum—which nonetheless still begs the question for why the first murder happened. *Dellinger*, 2006 WL 1679595, at *6.

2

proposed calling Tommy Griffin and Connie Branum as her character witnesses,[2] but neither appeared at Mr. Johnson's trial. The jury found Mr. Johnson not guilty of the charged offense at 5:57 p.m. on February 21, 1992, apparently because of a misunderstanding of the trial court's instructions, and Mr. Johnson was released from custody. According to the memorandum, Mr. Johnson was "supposedly a close associate of James Dellinger and Gary Sutton of Sevier Co[unty]."

The memorandum also states that "Agent Gregory advised that he understood that some of [Ms.] Hartman's family had been threatened that they were next after the disappearance of [Tommy] Griffin and [Connie] Branum." Agent Gregory suggested that the murders of Mr. Griffin and Ms. Branum may have been "contract/revenge killings in retaliation for the arrest of Lester Johnson." Mr. Webb acknowledged that he would have investigated Mr. Johnson had he seen Detective Gourley's memorandum.

*Dellinger v. State*, No. E2004-01068-CCA-R3PC, 2006 WL 1679595, at *4–5 (Tenn. Crim. App. June 19, 2006).

In the related capital case, the Court of Criminal Appeals further observed:

In order for the jury to have considered Johnson, rather than the petitioner, as the likely killer, it would have been necessary for jurors to believe that immediately after being acquitted at his trial in North Carolina, Johnson traveled to Sevier County, located the victim, and killed him shortly after the petitioner and Dellinger bailed the victim out of jail, all in retaliation for Johnson's initial arrest for an assault on Hartman. Although not advanced by the petitioner, it occurs to the court that Detective Gourley's suggestion of a "contract/revenge killing" in the memorandum could also be interpreted as an indication that Johnson had someone, but not the petitioner, kill the victim on Johnson's behalf.

---

[2] As will be shown below, almost certainly Branum and Griffin were not "character witnesses" for Ms. Hartman.  This mistake has been repeated throughout this litigation, and my significantly minimize their significance, and understate Lester Johnson's motive for wishing them ill.

3

*Dellinger v. State*, No. E200501485CCAR3PD, 2007 WL 2428049, at \*25 (Tenn. Crim.

App. Aug. 28, 2007), *aff'd in part, rev'd in part,* 279 S.W.3d 282 (Tenn. 2009).

In the capital case, the Court of Criminal Appeals noted that "[t]he State

seemingly concedes that the information on Johnson may not have been disclosed,

but it takes the position that it was not exculpatory or material." *Id.* at \*25.

Based on the evidentiary record available from the post-conviction hearing(s),

the Tennessee Court of Criminal Appeals did not find a *Brady* violation (in either

case):

> While it is possible for Mr. Johnson to have traveled from the courthouse in Sylva, North Carolina, to Sevier County, Tennessee, before midnight, there is nothing in the record to indicate that he did so, nor is there any indication that he was in Sevier County when Ms. Branum was killed.
> …
> As for Mr. Johnson's possible role in the offenses, there is no evidence that he was in Sevier County at the time of the offenses to elevate the connection, as the post-conviction court found, beyond a "mere conjecture or possibility."

*Dellinger*, 2006 WL 1679595, at \*4–5.

In the Amended Petition for Petition of Writ of Habeas Corpus, counsel for Mr.

Dellinger alleged that *Brady* violations, including the withholding of evidence about

Lester "Festus" Johnson, denied Mr. Dellinger a constitutionally fair trial. (DE 104,

PageID # 2096-98, ¶¶ 3.3.1 and 3.3.1.6). On December 13, 2016, counsel for Mr.

Dellinger moved for discovery, including a Rule 45 subpoena for the NC SBI File that

is requested here. (DE 113, PageID # 2251-53). When this request was made, counsel

had reason to believe, and averred, the following:

1.     Tina Hartman, the victim of Lester Johnson's assault, had been accused of cutting the throat of Mr. Johnson's cousin, Mike Vaughn, in September of 1990. (DE 113, PageID # 2252; DE 113-10).  No other information regarding how Mr. Johnson might have reacted to this cutting was available.[3]

2.     Tommy Griffin (the deceased in case 104, and the brother of Connie Branam) may have been present during the assault on Mike Vaughn.  (DE 113, PageID 2253).  What role he may have played was not further known.

3.     At Lester Johnson's trial, "Tina Hartman had purportedly offered the testimony of Tommy Griffin and Connie Branam as character witnesses on her behalf." (*Id.*).  Again, as will be shown below, this averment was partially incorrect. While both Branam and Griffin were subpoenaed as witnesses in Mr. Johnson's trial, they were not "character witnesses" on behalf of Ms. Hartman, rather—according to Ms. Hartman—they were subpoenaed by the NC SBI for reasons that she does not know.

4.     Witnesses in Mr. Johnson's subsequent trial received death threats. (DE 113, PageID # 2252).

5.     Ms. Hartman's family received threats, following the deaths of Griffin and Branam, that they would be next. (*Id.*).

6.     Lester Johnson was released from jail, following his acquittal on February 21, 1992.  (DE 113-10, PageID # 2305).  As noted by the Court of Criminal

---

[3] Not all cousins are inherently close, or even necessarily know each other.

Appeals, whether he then made his way back to East Tennessee, or went in another direction, was not then known to counsel.

On March 30, 2018, the court found that these grounds were inadequate to justify discovery and a Rule 45 subpoena: "This textbook example of a fishing expedition will not be abided." (DE 122, PageID # 2416-17).

## II. New Developments that reveal importance of further discovery, and address the concern that this is merely a "fishing expedition."

Counsel sincerely hopes that the evidence that has been discovered since March 30, 2018, through yesterday, September 20, 2018, will lead the Court to conclude that the request for discovery is no longer a fishing expedition, but is a narrowly tailored search for relevant and material evidence that would demonstrate (a) the prejudicial effect of the State of Tennessee's *Brady* violation regarding Lester "Festus" Johnson, and (b) Mr. Dellinger's innocence.

For years counsel has attempted to learn what may have happened in the Cherokee bathhouse that left Tina Hartman with a cut throat, Lester "Festus" Johnson in jail, and the two decedents-to-be subpoenaed as State's witnesses for his trial. Counsel has always possessed a good-faith belief that Tommy Griffin's murder, immediately after Mr. Johnson's departure from jail, was not mere coincidence. This was the basis for the first discovery request. However, until the filing of this motion, counsel did not fully understand the depths of Mr. Lester Johnson's potential motive to kill, nor did counsel have solid evidence that Mr. Johnson was in East Tennessee at the time of the murders.

6

The following recently revealed information establishes Lester Johnson's motive, and establishes that he was in East Tennessee at the time of the homicides.

### A. Tina Hartman: provides a previously unknown police report, establishes Lester Johnson's motive for revenge, and makes clear that he was profoundly dangerous.

The first key witness that has led to the discovery of additional evidence was Tina Hartman. For years, Ms. Hartman had not wished to be found and had refused to cooperate with prior counsel. (*See* Declaration of Aly Finn, Ex. 1, ¶¶ 3-5). Sometime after her throat slashing, the jury's decision to acquit Mr. Johnson, and the murder of two trial witnesses, she left East Tennessee and joined a travelling carnival. (*Id.* at ¶ 4).[4]

On August 17, 2018, Ms. Aly Finn found Ms. Hartman (who is going by a different legal name). (*Id.* at ¶ 2).Ms. Hartman agreed to speak with Ms. Finn and was interviewed in detail on August 18, 2018. (*Id.*). Ms. Hartman also provided her own copy of a police report related to her assault. (Attached, Ex. 2). Ms. Hartman, and the report revealed the following additional information:

1.  Prior to cutting her throat, Lester Johnson asked Ms. Hartman if she remembered Mike Vaughn. (Ex. 2).

2.  She reported to police that Mike Vaughn was a friend of her family, who had his throat cut, and who was run over by a vehicle. (*Id.*). She reported that she had been accused of involvement in the attack on Vaughn, and had been

---

[4] Years ago, attorneys from the Tennessee Post-Conviction Defender were able to find Ms. Hartman, but she was unwilling to speak to them at that time.

investigated (but cleared); however, there were still hard feelings over the incident. (*Id.*).

3. She did not know why Branum and Griffin were called as witnesses at the Johnson trial. (Ex. 1, ¶¶ 8(d), 8(e)).

4. It was the North Carolina SBI that wanted Branum and Griffin as witnesses at the trial. (*Id.* at ¶ 8(d).

5. The lead agent was (she said) Shane West (in fact, further investigation reveals his name is Kevin West). (*Id.* at ¶ 8(d)). Mr. West would know why Branum and Griffin were subpoenaed. (*Id.*).

6. The victim-witness coordinator who worked with Ms. Hartman was a man named John Warren. (*Id.* at ¶ 8(f)).

7. Ms. Hartman was escorted by multiple police cars to and from Lester Johnson's trial. She was told this was for her protection, so "they" wouldn't run her off the road. Ms. Hartman does not know who "they" were. (*Id.*at ¶ 8(h)).

8. The police report provided by Ms. Hartman, identified Mary Ann Huskey as having been present at the Cherokee, North Carolina biker rally before and after Lester Johnson's attack. Moreover, the police report, that counsel had not previously seen, indicated that Huskey may have placed the knife in the bathhouse that was later used by Johnson to cut Hartman's throat. After the throat cutting, Huskey refused to assist Hartman, according to this report, because "he would be after her then." (Ex. 2). The report clearly

8

indicated that Huskey was a significant witness and/or participant. (*Id.*).

9. Ms. Hartman knows James Dellinger and does not like him (she used a colorful term to describe him), but based on her knowledge of the various players, including Lester Johnson, she sincerely believes he is innocent of both murders. (Ex. 1, ¶ 7).

**B.     Mary Ann Huskey: Lester Johnson's girlfriend, at the time of the murders, establishes that he was in East Tennessee at the time of the killings and further ratifies that he was seeking revenge for the attack on his cousin, Mike Vaughn.**

Based on the additional information provided by Ms. Hartman, investigator Aly Finn sought out Mary Ann Huskey, who she interviewed on September 17, 2018. Ms. Huskey, while disputing information provided by Ms. Hartman, provided a sworn declaration that reveals additional, previously unknown information. (Attached, Ex. 4). This information is highly relevant to this discovery request.

1. Ms. Huskey drove Lester Johnson back to Kodak, Tennessee, after his acquittal. The drive took less than two-hours, and they were in Kodak before dark. (*Id.* at ¶ **7**). Thus, Lester Johnson was in East Tennessee prior to the disappearance and murder of Tommy Griffin. This addresses the Court of Criminal Appeals original concern: "As for Mr. Johnson's possible role in the offenses, there is no evidence that he was in Sevier County at the time of the offenses to elevate the connection, as the post-conviction court found, beyond a 'mere conjecture or possibility.'" *Dellinger*, 2006 WL 1679595, at *4–5.

2. On the drive back from North Carolina, Lester Johnson revealed that he

9

had cut Tina Hartman's throat, but had chosen not to kill her. He told Ms. Huskey: "The reason Tina is still alive was because she told me what I wanted to know about Mike Vaughn." (*Id.*at ¶ 7).

3. Ms. Huskey was aware of the earlier attack on Mr. Vaughn, where he "had been run over and left for dead" as a paraplegic. (*Id.* at ¶8). She knew that Mr. Johnson was very close to Mike Vaughn, and that what had happened to Vaughn upset Johnson. (*Id.*) She explained that "Mike came to mine and Lester's house often, and Lester would carry Mike to the bathroom and stuff. What happened to Mike really bothered Lester. He hated seeing his cousin like that." (*Id.*).

Thus, for the first time, with this declaration from Mary Ann Huskey, counsel for Mr. Dellinger has solid evidence that (a) Lester Johnson was in East Tennessee at the time of the murders of both Tommy Griffin and Connie Branum, (b) he had a very specific motive to kill, outside of the mere fact that they had been witnesses against him, and (c) he was willing to use violence (cutting a throat) to find out who he should punish for the assault on Mike Vaughn.

### C. Those involved in the prosecution of Lester Johnson all agree that material evidence will be found in the NC SBI file.

Aly Finn has interviewed the victim-witness coordinator and the lead SBI agent (as suggested by Ms. Hartman), as well as the lead prosecutor. All three individuals have suggested that material evidence will be found in the NC SBI file. (Ex. 1, ¶¶ 10-12). Agent West urged Ms. Finn to secure a subpoena for this file, so that he could discuss the relevant matters, further. (*Id.* at ¶ 11).

**D.    Shane Thornton, the son of Lester Johnson, makes clear that his father was a dangerous man, who was threatening witnesses before trial, and who bragged about cutting a woman's throat.**

On September 19, 2018, investigator Aly Finn found Mr. Johnson's son, Shane Thornton in Florida, and on September 20, 2018 she flew to meet him. (Ex. 1, ¶ 14). Mr. Thornton, in turn, provided a powerful declaration regarding his father. (Ex. 3). Mr. Johnson bragged to his son about cutting Tina Hartman's throat. (*Id.* at ¶ 3). While awaiting trial, Mr. Johnson used his son to deliver "hundreds" of sealed envelopes to various people in Sevierville and Maryville, Tennessee. (*Id.* at ¶¶ 5, 7). In some cases, Mr. Johnson had his son retype the letter, so it would not be in his handwriting. (*Id.* at ¶ 7). The letters that Mr. Thornton saw involved "snitches" and threats to "snitches;" Johnson hated "snitches." (*Id.* at ¶¶ 6, 11).

Mr. Johnson was involved in the drug trade, and had "dangerous connections" in Sevier County. (*Id.* at ¶ 10). He was an evil, but charming man. (*Id.*). Most people—other than Mr. Thornton's mother—were afraid of Mr. Johnson (she was so unafraid of him, that she shot him in the leg to keep him away from her son). (*Id.* at ¶¶ 10, 13). One example of how dangerous Mr. Johnson could be involved strychnine—he requested that his 15 y.o. son secure him a bottle of the poison for his use when he was released from jail. (*Id.* at ¶ 9).

### III.   Applicable Law.

A habeas petitioner is not automatically entitled to discovery. *Bracy v. Gramley*, 520 U.S. 899, 904, 117 S. Ct. 1793 (1997). Rather, discovery is permitted

11

if the petitioner shows "good cause." *Id.* at 908-09. Such cause may be shown with "specific allegations" that create a "'reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is…entitled to relief.'" *Id.* (quoting *Harris v. Nelson*, 394 U.S. 286, 300, 89 S.Ct. 1082 (1969).

As has been noted by this Honorable Court previously, mere "conclusory allegations" do not permit a "fishing expedition." *Williams v. Bagley*, 380 F.3d 932, 974 (6th Cir. 2004). Thus, the issues is whether the above allegations are merely conclusory, or whether they are of sufficient substance that they produce a "reason to believe" that additional information that would support a *Brady* claim will be in the NC SBI file(s).

To be entitled to relief on a *Brady* claim, Mr. Dellinger must show that (1) the suppressed evidence was favorable, (2) the evidence was suppressed either willfully or inadvertently, and (3) he suffered prejudice. *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936 (1999). The prejudice requirement, involves an examination of whether the suppressed evidence was "material," meaning "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433, 115 S.Ct. 1555 (1995). "The key question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 434.

12

### a.  Evidence Suppressed: the March 4, 1992 Memo about Lester Johnson.

In this case, the evidence that was not provided was the March 4, 1992 Memorandum prepared by Chief Detective Dale Gourley of the Blount County Sheriff's Department. (*Attached*, Ex. 6).  The failure to turn over this document was addressed in both Court of Criminal Appeals opinions, and was raised in issues 3.3.1[5], 3.3.1.4[6], 3.3.1.6[7] in Mr. Dellinger's Amended Petition for the Writ of Habeas Corpus. (DE 104, PageID # 2096-98).

In regards to Chief Detective Gourley's report, the State of Tennessee has conceded this was not turned over.  *Dellinger*, 2007 WL 2428049, at *25.  Moreover, the post-conviction court found that it was not disclosed. *Id.* at *24.  Whereas, most clearly the NC SBI file has not only not been turned over, but the State has consistently tried to prevent Mr. Dellinger from obtaining it. (*E.g. Respondent's Answer in Opposition to Discovery*, DE 115, 2341-45).  Thus, the issue of whether the evidence was "suppressed" is not in doubt.

### b.  The suppressed evidence was material, and the NC SBI files will further establish this.

Under the relevant materiality standard, the evidence that has been proffered in this Memorandum removes confidence in the reliability of the verdict.  *Kyles*, 514 U.S. at 433-34.  The NC SBI file can only provide further evidence that will cast

---

[5] General *Brady, Giglio* and *Napue* claim.

[6] Sub-claim regarding failure to turn over exculpatory evidence in the possession of, among other entities, the Blount County Sheriff's Department.

[7] Sub-claim regarding failure to turn over exculpatory evidence in the NC SBI file regarding Lester Johnson, and his rape/attempted murder prosecution.

13

further doubt on the verdict. With the declarations of Mr. Johnson's son and girlfriend (Ex. 3 and 4) we now have "reason to believe" that significantly more evidence will be found in those files. *Id.* Moreover, for purposes of this very limited discovery request, is it is now clear that counsel for Mr. Dellinger is not making "conclusory allegations" in hopes of landing a fish, but rather counsel has a genuine good-faith belief that the NC SBI file will contain additional exculpatory information. *Bagley*, 380 F.3d at 974.

Griffin and Branum were subpoenaed for a reason—the file will reveal this reason (which the available witnesses either no longer remember, or cannot provide without a subpoena for the file). Witnesses were clearly threatened—with Shane Thornton's declaration from yesterday making this abundantly clear—and Griffin and Branum were witnesses, thus the file will reveal more regarding Johnson's threats against them. Counsel's belief that the NC SBI file contains exculpatory information is shared by the lead agent for the North Carolina State Bureau of Investigation, the lead prosecutor against Mr. Johnson, and the Victim-Witness Coordinator. (Ex. 1, ¶¶ 10-12). Thus, this Honorable Court now has "reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is…entitled to relief.'" *Bracy*, 520 U.S. at 904.

Finally, based on the evidence now presented, this Honorable Court is confronted with a compelling case of actual innocence (or would be, once the full record is developed regarding Lester Johnson). *McQuiggins v. Perkins*, 569 U.S. 383,

14

386, 133 S.Ct. 1924 (2013); *House v. Bell*, 547 U.S. 518, 126 S.Ct. 2064 (2006); *Schlup v. Denno*, 513 U.S. 298, 115 S.Ct. 851 (1995).

## IV.  Conclusion

This Memorandum sets forth good cause, both factual and legal, so that limited discovery should be permitted, by way of a Rule 45 subpoena for the NC SBI files related to the investigation, prosecution and trial of Lester Johnson for the rape and assault on Angela Christina "Tina" Hartman in September of 1991, and related to the subsequent threats by Mr. Johnson against his prosecutors, the judge, and witnesses, including the deceased in this cause.

Respectfully Submitted,

Amy D. Harwell #18691
Office of the Federal Public Defender
Middle District of Tennessee
810 Broadway, Suite 200
Nashville, Tennessee 37203
615. 736. 5047
Email: Amy_Harwell@fd.org

*/s/ Amy D. Harwell*

### CERTIFICATE OF SERVICE

I hereby certify that a copy of this has been served on Assistant Attorney General Meredith Bowen electronically via the CM/ECF system service of which will be effectuated when filed.

*/s/ Amy D. Harwell*
Date: September 21, 2018

15