UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

JAMES **DELLINGER**,                    )
                                        )
Petitioner,                             )        No. 3:09-CV-104; 404
                                        )
vs.                                     )        Judge Varlan/Magistrate Poplin
                                        )
Tony **MAYS**, Warden, Riverbend        )
Maximum Security Institution            )        **Death Penalty Case**
                                        )
Respondent.                             )

### Declaration of Alysandra Finn

I, Alysandra Finn, an adult legal resident of Nashville, Davidson County, Tennessee, declare as follows:

1) I am an investigator for the Office of the Federal Public Defender (FPD). I have served as an investigator for the FPD since June 2016.

2) On August 17, 2018, I tracked down the woman known in 1992 as Tina Hartman—she was using a different legal name, and lives in a different state. She does not wish to disclose where she lives for fear of her safety. On that day, after some false starts, we eventually met at a biker bar, because she was distrustful of who we were. She subsequently agreed to meet with me again the following day, so that we could have a more structured conversation, without distractions.

3) Ms. Hartman (I will use her former name) was voluble and shared a great deal of information—once she became comfortable. It took some time to gain her trust.

4) Ms. Hartman is troubled to this day about what Lester Johnson did to her, and still distressed by his acquittal. Sometime after his release she left East Tennessee, and she worked with a travelling carnival.

5) She indicated that years before she had been found at the carnival by a Federal Public Defender Investigator from the Capital Habeas Unit East District for Mr. Sutton, but she had not liked him, so she ditched him at the Ferris wheel. She had also spoken to attorneys from the Post-

1

Conviction Defender Office , but she was upset with them because the investigator, Tammy Kennedy, brought another person to the meeting when she had promised to come alone.

6) She was certain that the killings of Tommy Griffin and Connie Branum were connected to people other than James Dellinger and Gary Sutton. She suggested that it was essential to read the book, "Mad Notions" to better understand the forces at work in East Tennessee in the late '80s and early '90s.

7) Ms. Hartman did not particularly like James Dellinger—"he was not my favorite person and was really as asshole." However, she does not want him to be on death row for a crime he did not commit.

8) Ms. Hartman provided me a great deal of additional information that I have yet to fully investigate, therefore I am not sharing it all in this declaration (though I am following up on much of that information, at present). Rather, in this declaration, I will focus on the information she provided regarding Lester Johnson, which follows:

   a. Ms. Hartman provided me a copy of the police report that was created on September 20, 1991 by Investigating Officer J.L. Jamison regarding Lester Johnson's attack on Ms. Hartman. As Mr. Johnson's public files were expunged following his acquittal, I had never before seen this document.

   b. Lester Johnson cut Ms. Hartman's throat as revenge for what happened to Mike Vaughn. Mr. Vaughn had been run over and left a paraplegic. Ms. Hartman had been present, but was not responsible for the attack on Mr. Vaughn.

   c. Ms. Hartman claimed that Lester Johnson got thirteen people to lie for him at trial, and thus he was acquitted.

   d. Ms. Hartman said that Connie Branum and Tommy Griffin were subpoenaed by the State of North Carolina, at the direction of the NC SBI, as "they knew something on Festus." The lead agent responsible for the NC SBI investigation was Shane West. He would know more about why they were subpoenaed.

   e. She said that Branum and Griffin had not been subpoenaed to be "character witnesses" regarding her character. She has no idea if they were subpoenaed to testify about Lester Johnson's character.

   f. The victim-witness coordinator who assisted her through the trial was John Warren. He would know more about the case.

2

g. Lester Johnson wrote at least one letter to his son, Shane, while he was in custody. Ms. Hartman received a copy of this letter from Lester Johnson's ex-wife, Angie. Ms. Hartman did not show me this letter. However, she indicated that the son, Shane, would have more information about the case.

h. The security at trial was unusual, six police cars escorted Ms. Hartman to and from trial. She said that an officer told her that if she was not escorted, "they would run her off the road."

9) Based on the information I received from Ms. Hartman, I tried to find Agent Shane West, Victim-Witness Coordinator John Warren, and the son, Shane.

10) On September 4, 2018, I spoke with John Warren. He was very friendly and wanted to help. However, he no longer had a significant memory of the case. His most vivid memory was that Lester Johnson was strange, and that after he testified the prosecution team was sure he would be convicted. Among other odd things Mr. Johnson said at trial, was "You can't get your burger here, because this ain't no Burger King." Mr. Warren believed that Agent West would know more, and the NC SBI files would contain more information, especially why a witness was subpoenaed to court and their interview memo, because all testifying witnesses would have been interviewed by an SBI agent or law enforcement officer.

11) On August 30, 2018, I spoke to NC SBI Agent Kevin West. He was very courteous and indicated a willingness to help. He also indicated that there would be evidence regarding Lester Johnson's threats against witnesses in the NC SBI file, including specific names and details. Agent West also stated that all witnesses subpoenaed would be in the file and why they were called to testify. However, he could not further speak with me about anything substantive, unless I secured a subpoena or court order for the NC SBI file. He strongly encouraged me to get a subpoena or court order so we could talk about this case.

12) On August 31, 2018, I met with Assistant District Attorney General Chris Clapsaddle Matheson. Ms. Matheson remembered Lester Johnson, as he was one of only two defendants who she believed had been a danger to her. Some months after his acquittal, she was placed under protection, due to threats that were reportedly made by Mr. Johnson. She and her children had to leave her home. She, also, remembered that Mr. Johnson had threatened witnesses prior to this trial. She did not remember why Connie Branum and Tommy Griffin had been called to testify. However, she agreed that the deaths of Branum and Griffin were likely to be related to the trial and acquittal of Mr. Johnson. She believed that additional

3

information would be possessed by NC SBI Agent Kevin West and in the NC SBI file. Absent a subpoena or court order for that file, she did not believe she could share any further specifics about the Johnson trial.

13) The police report provided by Ms. Hartman made significant mention of a woman called Mary Ann Huskey. On September 17, 2018, I found and interviewed Ms. Huskey, and she provided me a sworn declaration.

14) On September 19, 2018, I discovered that Mr. Johnson's son, Shane Thornton, resided in Florida. I booked a flight and met with Mr. Thornton on September 20, 2018. Mr. Thornton was willing to provide me a signed declaration regarding his father, and regarding the events surrounding his father's trial for the attack on Ms. Hartman.

I, declare, under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Alysandra Finn

Date: 9/21/2018

4