UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

JAMES DELLINGER,                        )
                                        )
            Petitioner,                 )
                                        )
v.                                      )          No.:    3:09-CV-404-TAV-DCP
                                        )
TONY MAYS,                              )
                                        )
            Respondent.                 )

## ORDER

On September 21, 2018, counsel for Petitioner filed a renewed Motion for Discovery in light of newly discovered evidence in this non-capital habeas action, arising under 28 U.S.C § 2254 [Docs. 129; *see also* Doc. 131-1]. Respondent has filed a response in opposition [Doc. 134], and Petitioner has filed a reply thereto [Doc. 135]. Pursuant to 28 U.S.C. § 636(b)(1), the presiding District Court judge referred this Motion for Discovery to the undersigned "for a hearing and/or disposition, as may be appropriate" [Doc. 146].

## I.    BACKGROUND

Petitioner was convicted in separate trials in separate counties for the 1992 first-degree murders of Connie Branum[1] (Sevier County) and Tommy Griffin (Blount County). Petitioner was sentenced to life in prison for Branum's murder but was subsequently given the death penalty for the murder of Griffin. On February 25, 2009, Petitioner filed a pro se petition for writ of habeas corpus in this court, pursuant to 28 U.S.C. § 2254, challenging his capital conviction and sentence in Blount County [*See* E.D. Tenn. Case No. 3:09-cv-104-TAV-DCP]. Counsel was appointed in

---

1 Connie Branam's last name is spelled both "Branam" and "Branum" in various records. *See, e.g., Dellinger v. State*, No. E2004-01068-CCA-R3PC, 2006 WL 1679595, at *1 (Tenn. Crim. App. June 19, 2006) ("Branum") and Doc. 149-1 p. 9-10 ("Branam"). This Court refers to the victim as Connie "Branum" throughout this document for consistency.

that action, and through counsel, Petitioner thereafter initiated the instant habeas action on September 11, 2009, challenging his Sevier County conviction [Doc. 1].

Petitioner originally sought discovery in this action in August 2010 [Docs. 16, 18-20], but those requests were denied as premature on March 31, 2011 [Doc. 42]. On April 27, 2016, Petitioner filed his amended § 2254 Petition, raising, *inter alia*, claims that (1) the prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963) by withholding "[i]nformation from the State Bureau of Investigation for North Carolina regarding the connection between the killing of Ms. Bran[u]m and Mr. Griffin and the investigation and prosecution of Lester Johnson, against whom Ms. Bran[u]m and Mr. Griffin were state's witnesses, for attempted rape and attempted murder," and (2) Petitioner is actually innocent of the crime of conviction [Doc. 104 at 29, 31, 63-64]. On December 13, 2016, Petitioner made another request for discovery, which specifically included a broad request for documents and records regarding the 1990 attack on Mike Vaughn, the investigation and prosecution of Lester Johnson for the attempted rape and murder of Tina Hartman, and any reports regarding threats made by Johnson from the Sevier County Sheriff's Department, the North Carolina State Bureau of Investigation, the Cherokee Nation Police Departments, and the chambers of the Superior Court judge from the General Court of Justice for Jackson County, North Carolina [Doc. 113]. However, the Court denied the motion on March 30, 2018, describing the request as a "textbook example of a fishing expedition" [Doc. 122].

Several months later, on September 21, 2018, counsel for Petitioner filed the instant Motion for Discovery, specifically requesting leave to serve a Rule 45 subpoena upon the North Carolina State Bureau of Investigations ("NC SBI") to obtain files related to the prosecution and trial of Lester Festus Johnson for the alleged rape and assault on Angela Christina Hartman in 1991 [Docs. 129-30]. Counsel argues that there is good cause to support this narrowly-tailored discovery

2

request due to newly discovered and previously unavailable evidence, and that the evidence requested could be material to both Petitioner's actual innocence of the crime(s) of conviction and to the prejudicial effect of the State's *Brady* violations. [Doc. 131-1 at 6]. The Motion indicates that Petitioner's investigative team was able to locate new witnesses that establish not only Johnson's propensity for violence, but also his motive and opportunity to commit the murders for which Petitioner was convicted [*Id.*].

First, counsel notes that its investigator, Aly Finn, was able to locate and interview Ms. Hartman, who had avoided detection and refused to speak with attorneys and investigators for years [*Id.* at 6-9]. In her declaration, Finn avers that she interviewed Hartman on two occasions in August 2018. [Doc. 130-1]. Despite Johnson's death, Hartman remains distressed by Johnson's assault and acquittal, and she still lives in fear for her safety, which has led her to use a different legal name and to prevent disclosure of her address [*Id.* at 1]. Hartman provided Finn with a copy of the police report created on the date of her assault, which is not a matter of public record due to Johnson's acquittal and subsequent expungement of his records [*Id.* at 2; *see* Doc. 130-2]. Hartman indicated that she was present for, but not involved in, an assault that rendered Johnson's cousin, Mike Vaughn, a paraplegic, and that Johnson cut her throat as revenge for that incident [Doc. 130-1 at 2]. According to Hartman, Branum and Griffin were not "character witnesses" for her; rather, the two were subpoenaed by the State of North Carolina because they knew something about Johnson.[2] However, Hartman does not know why they were subpoenaed or what their testimony

---

[2] A report from Sam Gregory of the NC SBI dated March 4, 1992 was introduced as an exhibit in one of Petitioner's state court proceedings [Doc. 135-3]. The report states:

> Hartman reportedly offered to have two character witnesses come over to N.C. and testify on her behalf. The two were to be Connie Bran[u]m and Tommy Griffin. Griffin did not show up for the trial. It is unknown at this time if Bran[u]m showed.

3

would have revealed, and she suggested that Shane West from NC SBI would be able to provide more information as the basis for the subpoenas [*Id.*]. Hartman provided Finn with additional facts supporting the idea that Johnson was influential and known to be dangerous and violent. She noted that she was escorted to and from the trial by multiple police cars and was told by an officer that, "if she was not escorted, 'they would run her off the road.'" [*Id.* at 3]. Additionally, Hartman stated that Johnson "got thirteen people to lie for him at trial" so as to ensure his acquittal [*Id.* at 2]. Hartman told Finn that, despite her belief that Petitioner is "really a[n] asshole," she is "certain that the killings of Tommy Griffin and Connie Branum were connected to people other than James Dellinger" and his co-defendant, Gary Sutton, and she does not want Petitioner to be on death row for a crime he did not commit [*Id.* at 1-2].

Based on the information provided by Hartman, Finn was then able to interview Mary Ann Huskey on September 17, 2018 [Doc. 131-1 at 9-10]. Huskey provided a declaration wherein she confirmed that she drove Mr. Johnson to Kodak, Tennessee following his acquittal on February 21, 1992, and that the two arrived "before it was dark" [Doc. 130-4 at 1; *see also* Doc. 135-3 at 1]. On the drive, Johnson told Huskey that he had cut Hartman's throat, but did not kill her "because she told [him] what [he] wanted to know about Mike Vaughn" [*Id.* at 2; *see also* Doc. 130-3 (Johnson's son, Shane Thornton, avers that Johnson told him during a jail visit that he had cut

---

Several places were shot up in Sevier Co. with a shotgun prior to the trial. Threats were made to most of the state's witnesses, judge and prosecutor. . . . [S]ome of Hartman's family had been threatened that they were next after the disappearance of Griffin and Bran[u]m.

\*\*\*

If the two murders [are] related to the afore listed incidents then these murders may have been contract/revenge killings in retaliation for the arrest of Lester Johnson.

[*Id.*].

Hartman's throat, and that he "bragged about it when he got out" and "did not deny [his guilt] to anyone")]. Huskey recalls hearing that Griffin was involved in the attack on Mike Vaughn [Doc. 130-4 at 2]. Counsel argues that Huskey's declaration is the first evidence that places Johnson in East Tennessee at the time of the murders of Griffin and Branum, and that it clearly demonstrates his willingness to use violence to discover the identity of and motive to kill the perpetrator of the assault against Vaughn [Doc. 131-1 at 9-10].

Finally, counsel points the court to statements that Finn obtained from numerous individuals involved in Johnson's case during interviews in August 2018, each suggesting that material evidence relevant to the murders of Branum and Griffin will be found in the NC SBI investigative file [*Id.* at 10-14]. John Warren, a victim-witness coordinator, advised Finn that he had a limited memory of the Johnson case, and indicated that Agent West and the NC SBI file would contain more useful information. He specifically noted that the file should contain interview memos as to Griffin and Branum that would reflect "why [the] witness[es] w[ere] subpoenaed to court," as all testifying witnesses are interviewed by SBI agents or other law enforcement officers [Doc. 130-1 at 3]. Agent Kevin West similarly advised Finn that the NC SBI file would contain more evidence regarding Johnson's threats against witnesses and would reflect why each witness was called to testify [*Id.*].[3] Assistant District Attorney General Chris Matheson stated that Johnson was "one of only two defendants" who had ever presented a danger to her; indeed, she was placed under protection months after Johnson's acquittal because of threats that he made to her and her children [*Id.*]. She related her belief that "the deaths of Branum and Griffin were likely to be

---

[3] Although West indicated a willingness to assist Finn, he stated that he could not discuss substantive matters with her until her office obtained a subpoena or court order for the NC SBI file, which he encouraged her to do so that the two could talk more about the Johnson case [Doc. 130-1 at 3].

related to the trial and acquittal of Mr. Johnson," and that additional information regarding those individuals would be available in the NC SBI file [*Id*. at 3-4].

Additionally, the Motion cites the declaration of Shane Thornton, Johnson's estranged son, who confirmed that, while Johnson was in jail, he delivered "sealed letters" to individuals in Sevierville, Tennessee on his behalf [Doc. 130-3 at 1]. He also recalled Johnson asking him to have certain letters typed before Thornton delivered them "so it does not come back at [Johnson]" [*Id.* at. 2]. Thornton remembers reading letters from Johnson "all about snitches and threats to snitches" and that Johnson once asked Thornton to "pick up his strychnine poison" and "hang on to the poison for when he got out of jail." [*Id.*]. He recalls that "[e]veryone was afraid of Lester" [*Id*.].

Respondent has filed a response in opposition to the Motion, arguing that the Motion is overbroad and fails to make a showing of good cause [Doc. 134]. Respondent first disputes the reliability, authenticity, or timeliness of the new evidence cited by Petitioner. Respondent notes that Hartman did not provide her own declaration or sworn statements and argues that Finn's declaration is insufficient evidence of Hartman's statements [*Id*. at 4-5]. Additionally, Respondent contends that "there is not way to attest to [the] authenticity" of the purported police statement allegedly provided to Finn by Hartman" [*Id*. at 5]. Respondent further argues that Thornton's declaration is unrelated to the scope of the discovery request as it contains no information regarding the NC SBI file or investigation, and that Petitioner's motion fails to explain why statements from Thornton and Huskey were not previously produced [*Id*.].

Respondent nonetheless argues that, even considering the new evidence, the allegations are too conclusory and speculative to warrant discovery to support either Petitioner's *Brady* claim or actual innocence claim [*Id* at. 5-7]. Respondent states that, even if the NC SBI file contained

6

information on who was subpoenaed and why, Petitioner fails to establish how knowing why Branum and Griffin were subpoenaed supports his claims [*Id.* at 7]. Additionally, they contend that new evidence establishing that Johnson was in Sevier County at the time of Branum's murder does not cast any doubt on the state court's decision on Petitioner's claims given its alternative holding [*Id.* at 7-8]. Finally, Respondent argues that, even if the NC SBI file contain evidence suggesting that Johnson had a motive to kill Branum, such evidence would not provide Petitioner with a basis for relief [*Id.* at 8-9].

Petitioner then filed a timely reply, along with several additional supporting documents [Doc. 135; Docs. 135-1 through 135-4]. First, Petitioner notes that, subsequent to the filing of the instant Motion, he was able to obtain a declaration from Ms. Hartman, despite her residual trauma and resistance to being found or becoming involved in this case [Doc. 135 at 1-2; *see* Doc. 135-1]. Hartman's attached declaration confirms the facts set forth in Finn's affidavit – namely, that Hartman remains fearful and traumatized by her attack at the hands of Johnson, that she has deliberately attempted to conceal her whereabouts and to avoid talking to investigators and law enforcement personnel, but that she agreed to speak with Finn when she was located in August of 2018 [Doc. 135-1]. She told Finn that: (1) she was the person who found Vaughn after he was attacked; (2) she believes Johnson attacked her as revenge for what happened to Vaughn; (3) Branum and Griffin could not have been subpoenaed to be "character witnesses" for her because she did not know either of them; (4) she was advised by NC SBI agent Kevin West that Branum and Griffin were subpoenaed because "they knew something on [Johnson]; (5) Johnson got people to lie for him at trial; and (6) she was escorted to and from trial by six police cars, a security measure that an officer told her was necessary so that she would not be run off the road, presumably

by "biker gangs" [*Id*. at 2-3].  Hartman stated that she also permitted Finn to scan trial exhibits and police reports regarding Johnson's attack on her [*Id*. at 2].

Next, Petitioner argues that Thornton's declaration is relevant "to support the reasonable inference that Mr. Johnson had something to do with Mr. Griffin's death," and specifically, to support the theory that Johnson had Branum and Griffin killed in retaliation for his arrest [Doc. 135 at 2].  Petitioner notes that he had insufficient information regarding Thornton until locating and speaking with Hartman and supports this argument with the declaration of former investigator, Ann Walker-King [*Id*. at 2-3; Doc. 135-2].  Walker-King, who worked on Petitioner's case from 2008 through her retirement in 2016, avers that she investigated whether the deaths of Branum and/or Griffin could be attributable to their drug activities and involvement in various drug conspiracies or could be due to their involvement in Johnson's prosecution for the attack on Hartman [Doc. 135-2 at 1].  Despite using all of the witness location resources available to her, Walker-King was never able to locate Hartman [*Id*. at 1-2].  She was able to interview ADA Matheson, who recalled her personal fear of Johnson and the security measures that were taken to protect various individuals involved in his prosecution, and who advised that Johnson's file was expunged following his acquittal [*Id*. at 2].  She also spoke with a female witness who indicated that Griffin had been involved in the attack on Vaughn, but refused to participate any further; additionally, she spoke to Vaughn himself, who refused to name his attackers [*Id*.].

Petitioner notes that Respondent's argument regarding the police report – that it is unauthenticated – actually supports his discovery request by demonstrating that there is potentially relevant evidence to which he has never been given access [Doc. 135 at 3].  Nonetheless, Petitioner provides a declaration from Jeffrey Jamison, identifying the report and confirming that he generated it in connection with his interview of Hartman in 1991 [*Id*. at 3; *see* Doc. 135-4].

8

Jamison's declaration further confirms that "everything related [to the investigation of Johnson] would be in the SBI file including every witness interview and every subpoena" because standard operating procedure requires that every subpoenaed witness be interview "prior to the issuance of the subpoena" and that the interview be documented in the SBI file [Doc. 135-4 at 1]. Petitioner maintains that the discovery request is sufficiently specific as to the reasons that he believes that he may be able to show his entitlement to relief if discovery is granted [Doc. 135 at 3-4].

On March 7, 2019, the district judge referred the Motion for Discovery to the undersigned "for hearing or disposition, as may be appropriate" [Doc. 146].

## II. LEGAL STANDARDS

Habeas petitioners do not have an automatic right to discovery. *See Johnson v. Mitchell*, 585 F.3d 923, 934 (6th Cir. 2009) (quoting *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001)). Discovery in habeas cases is controlled by Rule 6(a) of the Rules Governing Section 2254 Cases in the United States District Courts ("Habeas Rules"), which provides that "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery." *See Cornwell v. Bradshaw*, 559 F.3d 398, 410 (6th Cir. 2009) ("For good cause shown, the district court has the discretion to permit discovery in a habeas proceeding[.]"). A party's motion for discovery must provide "reasons for the request . . . and must specify any requested documents." Rule 6(b), Habeas Rules.

The Court is mindful that "more liberal discovery" may be appropriate in habeas cases involving a sentence of death, "where the stakes for petitioner[s] are so high." *See, e.g.*, *Payne v. Bell*, 89 F. Supp. 2d 967, 971 (W.D. Tenn. 2000) (citing *Lockett v. Ohio*, 438 U.S. 586, 604 (1978)); *see also Sample v. Colson*, 958 F. Supp. 2d 865, 887 (W.D. Tenn. 2013). Nonetheless, "[e]ven in a death penalty case," bald assertions and conclusory allegations are insufficient to

9

warrant discovery. *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003). Stated another way, Rule 6 simply does not permit a "fishing expedition masquerading as discovery." *Stanford*, 266 F.3d at 460; *see also Williams v. Bagley*, 380 F.3d 932, 974 (6th Cir. 2004).

Instead, the moving party bears the burden of demonstrating "good cause" to support the discovery request. *See Stanford,* 266 F.3d at 460. The Supreme Court has provided additional guidance with respect to the good cause inquiry, noting that "it is the duty of the court" to provide petitioner with adequate procedures and tools "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief[.]" *Harris v. Nelson*, 394 U.S. 286, 300 (1969). Thus, in assessing the merits of Petitioner's request for discovery, this Court must look at the specificity of petitioner's allegations, the relationship between the discovery requested and the claims raised in the habeas petition and the likelihood that the requested discovery may resolve any factual disputes that could entitle the petitioner to relief. *See, e.g.*, *Post v. Bradshaw*, 621 F.3d 406, 425 (6th Cir. 2010) (stating that discovery provides petitioner "that extra evidence he . . . needs to prove or strengthen his case"); *Braden v. Bagley*, 2007 WL 1026454, at *2 (S.D. Ohio Mar. 30, 2007) ("Rule 6's 'good cause' standard requires petitioner to at least attempt to identify what he expects to uncover through his discovery requests."); *Williams v. Bagley*, 380 F.3d 932, 974 (6th Cir. 2004); *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997) (allowing discovery relevant to "specific allegations" of fact in support of a claim of constitutional error). The petitioner does not, however, have to demonstrate "that the requested discovery would impact the verdict." *Sample*, 958 F. Supp. 2d at 888.[4]

---

[4] "The Sixth Circuit has not determined whether § 2254(e)(2) applies to motions for discovery." *See, e.g.*, *Sims v. Westbrooks*, 2016 WL 2642240, at *3 n.2 (W.D. Tenn. May 6, 2016)

## III. ANALYSIS

The Court finds that Petitioner's request for the NC SBI files related to the investigation, prosecution, and trial of Lester Johnson for the rape and assault of Ms. Hartman in September 1991, and related to the subsequent threats by Johnson, is significantly more specific and narrowly tailored than the prior request rejected by the Court. Moreover, the request is supported by additional, compelling evidence supporting counsel's argument. First, affidavits from multiple individuals have been submitted stating that additional, unknown information exists in the NC SBI file regarding what Griffin and Branum would have testified to at Johnson's trial. Second, even the documents submitted along with the request suggest that law enforcement believed that foul play from Johnson and his associates was a possibility in the instant case. Third, multiple individuals have advised counsel that they have information that they would be willing to share if a court order for the NC SBI file is entered.

Based on these circumstances, the Court finds that Petitioner has demonstrated sufficient cause to believe that the NC SBI file could contain information which may support a determination that Johnson was the real perpetrator of the murders at issue in this case, and thus lead to relevant evidence regarding Petitioner's habeas corpus petition. There is no doubt that any newly-discovered evidence of actual innocence could allow Petitioner to, at a minimum, have any

---

(quoting *Hill v. Anderson*, 2010 WL 5178699, at *8 (N.D. Ohio Dec. 14, 2010)). However, numerous district courts within the Circuit have concluded that a petitioner may show good cause under Habeas Rule 6 without meeting the higher standard for an evidentiary hearing in 28 U.S.C. § 2254(e)(2). *See, e.g.*, *McNeill v. Bagley*, 2019 WL 4017047, at *48 (N.D. Ohio Aug. 26, 2019) (collecting cases to support the conclusion that § 2254(e)(2) was not intended to bar federal courts from considering claims "where the evidence at issue was unavailable to the petitioner until the federal court granted habeas discovery"); *Payne*, 89 F. Supp. 2d at 970; *Braden*, 2007 WL 1026454, at *6 (distinguishing discovery from factual development under § 2254(e)(2)); *cf. Simmons v. Simpson,* 2009 WL 4927679, at *5-6 (W.D. Ky. Feb. 12, 2009) (stating that this view is not unanimously held by federal courts).

11

defaulted or unexhausted claims considered on their merits. *See Fontenot v. Allbaugh*, 402 F. Supp. 3d 1110, 1129-30, 2019 WL 3995957 (E.D. Okla. Aug. 21, 2019) (appeal pending) (collecting / discussing numerous cases); *Schlup v. Delo*, 513 U.S. 298, 315 (1995).

Accordingly, upon a demonstration of good cause, and in the interests of justice, Petitioner's discovery motion will be granted solely as to the NC SBI file. If the information contained therein leads counsel to find information and/or facts that may constitute arguable good cause for additional discovery, counsel must file a motion and seek leave of Court before proceeding.

## IV. CONCLUSION

For good cause shown and pursuant to authority of the undersigned to enter a final disposition on this matter, Petitioner's Motion for Discovery [Doc. 129] is hereby **GRANTED. The parties are instructed to adhere to the deadlines set forth in the Court's prior Order [Doc. 146] in that** Petitioner shall notify the Court **within sixty days** after the close of discovery **– in this case, upon receipt of the file detailed herein –** if he intends to file a motion for leave to amend his petition. If the Petitioner does intend to seek leave to amend his petition, the Court may order the parties to confer regarding an appropriate briefing schedule, or the Court may order the parties to appear for a telephonic or in-person scheduling conference. If Petitioner does not intend to seek leave to amend his petition, Respondent may seek leave to amend its answer to the amended § 2254 petition **within thirty days** of the deadline for Petitioner to seek leave to amend.

**IT IS SO ORDERED.**

E N T E R :

_____
Debra C. Poplin
United States Magistrate Judge

12