UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

JAMES **DELLINGER**,                                )
                                                    )
Petitioner,                                         )          No. 3:09-CV-104; 404
                                                    )
vs.                                                 )          Judge Varlan/Magistrate Poplin
                                                    )
Tony **MAYS**, Warden, Riverbend                    )
Maximum Security Institution                        )          **Death Penalty Case**
                                                    )
Respondent.                                         )

### Declaration of Alysandra Finn, Investigator

I, Alysandra Finn an adult legal resident of Franklin, Williamson County, Tennessee, declare as follows:

1. I am an investigator with the Office of the Federal Public Defender for the Middle District of Tennessee. I was a probation officer in the Davidson County Juvenile Court system from 1999 to December 2012. I then worked as an investigator for the Tennessee Post-Conviction Defender from January 2012 to May 2016. Since June 2016, I have worked as an investigator for the Federal Public Defender. As part of my duties, I was assigned to assist with investigation in the James Dellinger case after the retirement of the primary case investigator, Ann Walker-King in the late summer of 2016.

2. As part of my duties in this case, I interviewed Tina Hartman in 2018. Ms. Hartman was of interest to me, because the victims in the Dellinger case were called as witnesses in a rape and attempted murder trial in North Carolina where Ms. Hartman was the intended victim and Lester "Festus" Johnson was the defendant. It is unknown whether Mr. Griffin and Ms. Branam complied with the subpoenas to testify in court, but we know that Mr. Griffin went missing hours after Mr. Johnson was acquitted and released from jail in western North Carolina. Ms. Hartman said she was unaware of why Mr. Griffin or Ms. Branam would have been subpoenaed, she certainly had not suggested that they be subpoenaed. Thus it appeared to her, as well

as myself, that the prosecutor and/or law enforcement had independently discovered that they had relevant information about Lester Johnson.

3.  I also interviewed Mr. Johnson's son, Shane Thornton, who provided the declaration submitted in support of the supplemental request for discovery on September 21, 2018 (R. 130-3). As that declaration made clear, Mr. Johnson was actively involved in threatening the lives of people who he believed were cooperating with the authorities against him.

4.  Prior to filing the Supplemental Request for Discovery, I spoke with NCSBI Special Agent West, who told me that he could not speak with me about the Lester Johnson matter until I secured a court order and the NCSBI file, which he would use to refresh his memory.

5.  Upon receipt of the NCSBI file on March 17, 2020, and after I thoroughly reviewed the file, I called Agent West on April 2, 2020 to let him know we had his file. He requested I email him the order and the SBI file we received. I emailed those documents to him on April 2, 2020. On April 8th, I called Agent West who seemed unaware I had emailed him. Agent West thereafter checked his email and reviewed the file I had sent.

6.  Agent West said that the file we provided him was not the entire NCSBI file. Missing from this copy were the handwritten notes he and Agent Gregory would have kept as part of the "master file."

7.  The NCSBI file contains references to the Cherokee Police Department. Agent West informed me that the Cherokee Police Department was the first to arrive on the scene, because the crime occurred at the El Jawa Campground in Cherokee, NC.

8.  Agent West indicated that it is quite possible that his "master file" has been destroyed by the NCSBI; prior to 2008 the NCSBI did not have a consistent practice of fully preserving their investigative files.

9.  However, Agent West indicated that the District Attorney's Office should have a file on this case and should have notes regarding his and Agent Gregory's reasoning for subpoenaing Mr. Griffin and Ms. Branam.

10. I called and left a message for ADA Matheson, with the district attorney's office, about this matter on April 13, 2020. On April 17th, ADA Matheson returned my call and we spoke, briefly. She recalled Mr. Johnson and the

trial. As she had with Ms. Walker-King in the past, ADA Matheson spoke of Mr. Johnson's threats toward her and the court. On our April 17th phone call, Ms. Matheson let me know that the District Attorney's file has been destroyed and she no longer has access to information about why Tommy Griffin and Connie Branam were subpoenaed.

11. Agent West suggested that I speak with his former partner, Agent Gregory. Agent West did not have a phone number or address for Agent Gregory. I attempted to locate Agent Gregory on April 9th, 10th, and 17th, finding several possible phone numbers. As of this writing, I have not yet located Agent Gregory.

12. In early April, while unable to actively investigate my cases due to the COVID-19 virus, I discovered that the Oxygen channel had produced a story about the Branam and Griffin murders, "Smokey Mountain Murders," for their series, "Murdered by Morning." I do not regard the story as authoritative, as it misreported various elements regarding the investigation (including announcing that Ms. Branam was shot in the back of the head despite the autopsy and the proof at trial indicating that the fire had made it impossible to determine if she had been shot at all). However, while this show was clearly sensational and more entertainment than journalism, it contained interviews with law enforcement investigators and prosecutors revealing information that had never been provided to the defense:

    a.   TBI Agent David Davenport (now Assistant Chief of the Knox County Sherriff's Department), revealed that his investigation developed two suspects with whom Tommy Griffin argued at Howie's Hideaway on the night of Mr. Griffin's disappearance: "Chief" and "Cowboy." Davenport further stated that "Chief" and "Cowboy" admitted to having argued with Mr. Griffin on that night. A Blount County District Attorney explained that "Chief" and "Cowboy" were eliminated as suspects because (1) they did not have serious records and (2) they had stayed at the bar after Tommy Griffin left. Given that Mr. Dellinger, similarly, did not have a serious record prior to his conviction for this crime, and given his insistence in his innocence for over thirty years, I intend to investigate this "Cowboy" and "Chief." Certainly, the two reasons for clearing them are less than compelling as (1) Mr. Dellinger didn't have a serious record, either, and (2) Mr. Griffin was not murdered for many hours after he left Howie's, which means the fact that Chief and Cowboy stayed at Howie's' longer than he did is likely irrelevant.

b. Similarly, when interviewed by the Oxygen network, Chief Davenport revealed that law enforcement compiled a list of every Ford Falcon in the area at the time of Tommy's disappearance (it is unclear from his statement, whether the Falcon search area was limited to Blount County, or included some greater portion of East Tennessee). However, Chief Davenport said they found a Falcon owner who met the description of the woman that Dellinger said had picked Griffin up, after his release on bond. Chief Davenport said this woman was unable to provide an alibi for that evening. I want to interview Chief Davenport about this woman. I would like to obtain a copy of the list of Ford Falcon owners that he indicated law enforcement produced. I would very much like to investigate this woman myself: is there any connection between her and Lester Johnson, or with any of the other alternative suspects? However I am unable to do these tasks while confined to my home.

13. The ABA Guidelines for the Representation of Capital Cases reflect the prevailing professional norms required for capital defense work. Included in those Guidelines is the admonition that capital investigation is to be done in-person, face-to-face. It is my experience that even public servants are more likely to assist when I make my request in-person, and that regular citizens and especially alternative suspects tend to be evasive over the telephone. Until I can travel, my ability to conduct a competent and ethically proper investigation is significantly limited.

I, declare, under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Alysandra Finn

Date: 4/23/2020