# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT KNOXVILLE

| | |
|---|---|
| JAMES DELLINGER, | ) |
| Petitioner, | ) ) ) |
| v. | ) No. 3:09-CV-404-TAV-DCP |
| TONY MAYS, | ) ) ) |
| Respondent. | ) |

## MEMORANDUM AND ORDER

Before the Court are Petitioner's Motion for Discovery and Motion to Extend Discovery [Doc. 173]. Respondent filed Opposition to Petitioner's motions [Doc. 180], and Petitioner has filed his Reply [Doc. 181]. For the reasons stated herein, the Petitioner's motions are **DENIED**.

### I. BACKGROUND

Petitioner commenced this non-capital habeas corpus proceeding under 28 U.S.C. § 2254, challenging his first-degree murder conviction and life sentence for the death of Connie Branam ("Branam"). [Doc. 104 at 5]. Petitioner has also filed a related habeas corpus petition with the Court for his capital murder conviction relating to the death of Tommy Griffin ("Griffin")—Branam's brother. [*See* 3:09-cv-104]. He requests for the Court to set aside these convictions on various grounds, including prosecutorial misconduct, ineffective assistance of trial and appellate counsel, the prosecution's withholding of exculpatory evidence under *Brady v. Maryland*,[1] claims of innocence, and "other errors and failures that occurred at trial[.]" [Doc. 104 at 63].

Petitioner has filed several discovery motions in this non-capital habeas corpus proceeding. On August 13, 2010, Petitioner filed his first motion for discovery, seeking physical evidence from

---
[1] 373 U.S. 83 (1963).

the Sevier County crime scene that Petitioner believed was in Tennessee Supreme Court's and Sevier County Sheriff Department's possession. [Doc. 16 at 3].[2] Petitioner also requested records, files, and materials from the Tennessee Bureau of Investigation ("TBI") relating to the deaths and investigation of Griffin and Branam. [*Id.*]. The Court denied Petitioner's motion as premature but allowed him to renew his discovery request. [Doc. 42].

On December 13, 2016, Petitioner filed his second discovery motion, seeking the shell casing and tire tread impressions from the Sevier County crime scene, [Doc. 113 at 3]; "all records" from North Carolina State Bureau of Investigation's ("NC SBI") and Cherokee Nation Police Department's investigation into Lester Johnson's ("Johnson") 1991 rape and attempted murder of Tina Hartman ("Hartman"), [*id.* at 6]; and "any bench notes" from the judge presiding over Johnson's trial, [*id.*]. Petitioner also sought to depose Branam's brother, Billy Griffin. [*Id.* at 3]. In the Court's Memorandum and Order, it stated that Petitioner's request for discovery was a "textbook example of a fishing expedition" and denied Petitioner's motion for failure to show good cause for the requested discovery under Rule 6(a) of the Rules Governing Section 2254 Cases. [Doc. 122 at 12].

On September 21, 2018, Petitioner filed a renewed motion for discovery in light of newly discovered evidence. [Doc. 129]. Petitioner filed his motion following Federal Public Defender Investigator Alysandra Finn's ("Finn") interview with Hartman. Upon interviewing Hartman, Finn learned that the NC SBI subpoenaed Griffin and Branam to testify against Johnson at his trial. [Doc. 130 at 5]. Petitioner requested the Court's leave to serve a subpoena upon the NC SBI under Rule 45 of the Federal Rules of Civil Procedure, stating that the NC SBI file "can only provide further evidence that will cast further doubt on the [Petitioner's] verdict." [*Id.* at 13–14].

---

[2] Branam's body was found in Sevier County.

2

On February 5, 2020, the Court granted Petitioner's motion for the narrow purpose of determining whether the NC SBI file contained "information which may support . . . that Johnson was the real perpetrator of the murders[.]" [ Doc. 165 at 11]. Consistent with the Court's March 7, 2019 Order,[3] Petitioner was ordered to notify the Court within sixty days of the close of discovery, *i.e.*, upon receipt of the NC SBI file, if he intended to amend his Amended Petition. [*Id.* at 12]. In the alternative, if Petitioner did not seek the Court's leave to amend the Amended Petition, Respondent could seek leave to amend its Answer to the Amended Petition. [*Id.*].

On April 24, 2020, Petitioner moved for a sixty-day extension of the "deadline set by the Court's February 5, 2020 Order" due, in part, to Governor Lee's Shelter at Home Order in response to the COVID-19 pandemic. [Doc. 166 at 1–3]. According to Petitioner, Governor Lee's order "significantly hindered" Finn's attempts to locate information that was missing from the NC SBI file. [*Id.* at 2; Doc. 167 at 3–4]. The Court granted Petitioner's unopposed motion for an extension to allow Finn to locate (1) information about Branam and Griffin, or why the two murder victims had been subpoenaed to testify against Johnson; and (2) information regarding the investigation of Johnson's threats against other witnesses, including the judge, district attorney, and law enforcement. [Doc. 168 at 7]. The Court reiterated, however, that Petitioner must file a separate motion for additional discovery on information Finn sought outside the scope of the NC SBI file. [*Id.*]

---

[3] The Court's March 7, 2019 Order provides that, if Petitioner's renewed motion for discovery was granted, Petitioner was to notify the Court within sixty days after the close of discovery if he intended to file a motion to amend his Amended Petition. [Doc. 146]. According to this Court's February 5, 2020 Order, the close of discovery was "upon [Petitioner's] receipt of the [NC SBI] file[.]" [Doc. 165 at 12]. According to Petitioner, he received the NC SBI file on March 17, 2020. [*See* Doc. 166 at 2 n.3].

Now before the Court is Petitioner's fourth motion for discovery in which he seeks the Court's leave to issue a Rule 45 subpoena for the TBI's *"complete* file" to discover information that was missing from the NC SBI file and to discover alleged exculpatory evidence Finn learned while watching a documentary called "Smokey Mountain Murders" ("SMM documentary"). [Doc. 174 at 5, 6, 10 (emphasis added)].[4] Petitioner further requests a second extension of the discovery deadline by ninety days, regardless of the outcome of his discovery motion. [*Id.* at 14].[5] In section II, the Court will begin by addressing whether Petitioner met his burden of showing good cause for discovery under Rule 6 of the Rules Governing Section 2254 Cases. The Court will then address whether Petitioner has shown good cause to extend discovery in section III of this Memorandum.

## II. MOTION FOR DISCOVERY

### A. LEGAL STANDARD

The broad discovery rules under the Federal Rules of Civil Procedure that govern the usual civil proceedings are inapplicable to habeas proceedings. *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). A habeas petitioner, therefore, "unlike the usual civil litigant" is not entitled to discovery as a matter of right. *Id*. Instead, a habeas petitioner may only invoke discovery "to the extent that [ ] the judge[,] in the exercise of h[er] discretion and for good cause shown, grants leave to do so[.]" Rule 6(a) of the Rules Governing Section 2254 Cases; *see Stanford v. Parker*, 266 F.3d

---

[4] Petitioner states that the SMM documentary discusses the murders of Branam and Griffin. [Doc. 174 at 6]. Petitioner moved to file this documentary with the Court under seal [Doc. 182], and the Court granted Petitioner's motion [Doc. 183]. The record reflects, however, that Petitioner has not yet filed the documentary with the Court.

[5] Should the Court grant Petitioner's motion for discovery, Petitioner specifically asks for no less than a ninety-day extension for discovery from the time he receives the TBI file. Petitioner, in the alternative, asks for a ninety-day extension of the discovery deadline to allow Finn to conduct in-person interviews, discussed in more detail below. [*See* Doc. 174 at 14].

4

442, 460 (6th Cir. 2001) ("A district court has discretion to grant discovery in a habeas case upon a fact specific showing of good cause under Rule 6."); *see also Gabrion v. U.S.*, No. 1:15-cv-447, 2016 WL 11642335, at *1 (W.D. Mich. Sept. 20, 2016) ("The rules do not distinguish between capital habeas cases and non-capital habeas cases." (citing *Williams v. Bagley,* 380 F.3d 932, 974 (6th Cir. 2004))) .

Good cause exists when a petitioner sets forth *specific* allegations of fact that would give the court "reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief[.]" *Harris v. Nelson*, 394 U.S. 286, 300 (1969); *see, e.g.*, *Bracy*, 520 U.S. at 908–09 (holding that the petitioner was entitled to discovery when he provided the court with "[a]dditional *evidence*" to support his judicial bias claim) (emphasis added). A petitioner's conclusory or speculative allegations, on the other hand, are insufficient to warrant discovery under Rule 6. *Williams*, 380 F.3d at 974 ("Rule 6 does not 'sanction fishing expeditions based on a petitioner's conclusory allegations.'" (quoting *Rector v. Johnson*, 120 F.3d 551, 562 (5th Cir. 1997))); *see Murphy v. Johnson*, 205 F.3d 809, 814 (5th Cir. 2000) (stating that "a petitioner's factual allegations must be specific, as opposed to merely speculative or conclusory, to justify discovery under Rule 6")*; see also Shank v. Mitchell*, No. 2:00-cv-17, 2009 WL 3210350, at *6, 9 (S.D. Ohio Sept. 30, 2009) (holding that the petitioner was not entitled to unfettered access to government files "in the hopes that he will find something useful").[6]

---

[6] In his motion, Petitioner cites to *Payne v. Bell*, 89 F. Supp. 2d 967 (W.D. Tenn. 2000), in which the petitioner sought discovery under Rule 6(a) in his capital habeas case. The court stated that "more liberal discovery [under Rule 6(a)] is appropriate in capital cases where the stakes for petitioner are so high." *Id.* at 971. Petitioner, however, has not explained how *Payne* might apply to the present motion that he has filed in his *non-capital* habeas corpus case. In construing Petitioner's motion, he *does* appear to be seeking discovery relating to Griffin's murder as well as Branam's murder. However, this Court notes that there is no pending discovery motion in Petitioner's capital habeas corpus case. [*See* 3:09-cv-104]. This Court further notes that *Payne* pre-dates Sixth Circuit opinions that are binding on this Court. *See, e.g.*, *Williams v. Bagley*, 380

5

## B. DISCUSSION

Petitioner maintains that there is "good cause to believe" that the TBI file will contain material evidence due to "[t]wo major developments." [Doc. 174 at 6]. The first major development arises out of "exculpatory evidence" that Finn learned while watching the SMM documentary. [*Id.* at 6–7, 12]. According to Finn, former TBI Agent David Davenport[7] appeared in the SMM documentary and revealed that he developed two alternative suspects, "Chief" and "Cowboy," while investigating Branam's death. [*Id.* at 6; *see* Doc. 171-1 at 3–6].[8] According to Petitioner, Agent Davenport revealed in the SMM documentary that "Chief" and "Cowboy" apparently argued with Griffin before his disappearance, but Petitioner maintains that the prosecution never submitted information relating to these two suspects to his attorneys. [Doc. 174 at 6, 11].

---

F.3d 932 (6th Cir. 2004); *Stanford v. Parker*, 266 F.3d 442 (6th Cir. 2001). Neither *Williams* nor *Stanford* referenced *Payne* or discussed the application of a more liberal discovery standard. In fact, in *Stanford*, the Sixth Circuit stated that "[*e*]*ven in a death penalty case*, 'bald assertions and conclusory allegations do not provide sufficient ground to warrant . . . discovery[.]'" 266 F.3d at 460 (emphasis added) (quoting *Zettlemoyer v. Fulcomer*, 923 F.2d 284, 301 (3d Cir. 1991)). The Sixth Circuit in *Stanford* denied the petitioner's motion for discovery in his capital habeas corpus case because, "in light of the evidence and the state court proceedings[,] . . . . the discovery sought . . . would not resolve any factual disputes" and was "a fishing expedition masquerading as discovery." 266 F.3d at 460. Similarly, in *Williams*, the Sixth Circuit held that the petitioner, in his capital habeas corpus case, failed to show good cause for discovery relating to his ineffective assistance of counsel and *Brady* claims. 380 F.3d at 936–37.

[7] A review of the state record indicates that Agent Davenport testified at Branam's trial. At the time of his testimony, he was a special agent with the TBI and investigated Branam's death in Sevier County. [Doc. 149-20 at 40]. Petitioner explains in his motion that Agent Davenport was the Chief of the Knox County Sheriff's Department at the time of the SMM documentary. [Doc. 174 at 6]. Throughout his motion and reply, Petitioner refers to Davenport interchangeably as "Agent Davenport" and "Chief Davenport." [*See id.* at 6; *see also* Doc. 181 at 4–5]. For purposes of consistency, the Court will refer to him as "Agent Davenport."

[8] In support of his motion, Petitioner relies on Finn's former declaration filed with the Court [Doc. 171-1], as well as Finn's declaration attached to his present motion [Doc. 174 at 16–22].

6

Finn also learned while watching the SMM documentary that law enforcement compiled a list of every Ford Falcon in the area and investigated a woman who was an owner of a Ford Falcon. [*Id.* at 7]. The woman matched a description of a woman whom Petitioner and his nephew, Gary Sutton ("Sutton"),[9] insisted "[s]ince the very beginning of this case" left the Blount County Jail with Griffin after they made Griffin's bail. [*Id.*]. Petitioner argues that the Ford Falcon list and information regarding the woman are also exculpatory evidence developed by the TBI that the prosecution did not disclose to Petitioner's attorneys. [*Id.*].

The second "major development[ ]" arises out of the lack of information contained in the NC SBI file regarding the investigation of Johnson. [*Id.* at 6]. Finn states that handwritten notes from NC SBI Agents West and Gregory regarding their investigation of Johnson were missing from the NC SBI file and, "[o]f particular importance," she further states that the following information was missing from the file: (1) information as to why Branam and Griffin were subpoenaed to testify against Johnson during his trial; (2) information regarding Johnson's threats against witnesses; and (3) information regarding security precautions taken by those witnesses whom Johnson threatened, including the presiding judge and prosecutor who tried Johnson's case. [*Id.* at 8; Doc. 174-1 ¶ 3].

Petitioner, therefore, maintains that there is good cause for discovery for two reasons. He first states that the TBI file is "the best remaining source for information" regarding Johnson's motive to kill Branam and Griffin—information that Finn did not find in the NC SBI file. [Doc. 174 at 6]. Second, he relies on the SMM documentary as grounds for good cause, because he maintains that it revealed exculpatory evidence relevant to Petitioner's *Brady* claim under 3.3 of his Petition. [*Id.* at 9; *see* Doc. 104 at 29]. Petitioner, specifically, expects to find the following

---

[9] Sutton was also convicted of Branam's murder, and he and Petitioner were tried together.

7

information in the TBI file: (1) Agent West's and Agent Gregory's investigative notes regarding Johnson; (2) a Ford Falcon list and information regarding an unidentified woman who drove a Ford Falcon; and (3) information regarding a feud between Petitioner, Griffin, and Sutton and "Chief" and "Cowboy." [*Id.* at 7–8, 11]. The Court will analyze whether there is good cause for the information which Petitioner seeks under Rule 6 of the Rules Governing Section 2254 Cases.

### 1. Investigative Notes Regarding Johnson

Petitioner argues that there is a "reasonable probability" that the TBI file will contain investigative information relating to Johnson, and he appears to offer two reasons in support of his argument. [Doc. 174 at 8]. He states that "[i]t is clear that NCSBI communicated with Tennessee [about Johnson's threats]" based on a March 4, 1992 note by Chief Detective Dale Gourley of the Blount County Sheriff's Department reflecting a telephone call he received from NC SBI Agent Gregory. [*Id.*].[10] Petitioner therefore avers that, based on this communication, the TBI file will contain information regarding Johnson. [*Id.*]. He also relies on the SMM documentary as grounds for good cause to subpoena the TBI file, stating that "it is hard to imagine he [Agent Davenport] would not have followed up with an investigation of . . . Johnson." [*Id.* at 8–9].

Respondent argues that the lack of information in the file is not good cause for discovery because Petitioner's argument that this information exists is "nothing more than tenuous speculation." [Doc. 180 at 10]. He maintains that the link between the TBI's investigation into the Branam and Griffin murders and Johnson is not "concrete." [*Id.*]. To the extent, moreover, that Petitioner relies on the SMM documentary as grounds for good cause for discovery,

---

[10] This note was previously filed with the Court as an exhibit to Petitioner's second discovery motion. [Doc. 113-10]. The note details Johnson's attack on Michael Vaughn and Hartman. It also references "threats made" to the prosecutor and the judge who presided over Johnson's trial. [*Id.*].

8

Respondent argues that Johnson is never mentioned by Agent Davenport or anyone in the SMM documentary—a fact that Petitioner does not dispute in his reply. [*Id.* at 7].

Petitioner's allegations that the TBI file will contain investigative information regarding Johnson are speculative, and he has failed to meet his burden of showing good cause for discovery under Rule 6. Despite relying on Finn's declaration in support of his motion, Finn never once states in her declaration that she believes the missing information from the NC SBI file will be found in the TBI file. She, instead, details her efforts to locate Agent Davenport and to locate the missing information from the NC SBI file. [Doc. 174-1 at 2–4]. Finn also states, however, that Agent West confirmed that the "NCSBI master file" containing the notes was destroyed. [*Id.* ¶ 7]. Although Finn states that locating former TBI Agent Davenport "has become more important" in light of the notes having been destroyed, she only mentions her intention to interview him and makes no mention of the TBI file that would support good cause to subpoena it. [*Id.* ¶ 5]. Petitioner, therefore, merely relies on "conclusory allegations," that the TBI file will contain the missing NC SBI notes, none of which are supported by Finn's declaration. *Stanford*, 266 F.3d at 460 ("'[B]ald assertions and conclusory allegations do not provide sufficient ground to warrant . . . discovery[.]'" (citation omitted)). For these reasons, the Court construes Petitioner's discovery request, as it relates to subpoenaing the TBI to obtain investigative notes regarding Johnson, as a fishing expedition based on mere speculation. *Stanford*, 266 F.3d at 460 (holding that the district court did not abuse its discretion by "denying a fishing expedition masquerading as discovery").

### 2. Ford Falcon List

Petitioner states that the TBI file is "certainly the best source[ ]" to locate the Ford Falcon list and information regarding a woman who drove a Ford Falcon. [Doc. 174 at 11]. He maintains

9

that the SMM documentary is "concrete proof" that this information is exculpatory evidence developed by the TBI that the prosecution never disclosed to Petitioner's attorneys. [*Id.* at 10].[11]

Respondent argues that Petitioner misconstrues Agent Davenport's commentary during the SMM documentary and that Petitioner merely speculates that the Ford Falcon list exists. [Doc. 180 at 8]. According to Respondent, Agent Davenport's comments merely established that police were reviewing existing motor vehicle records to follow up on Petitioner's statement to police that Griffin left a bar with a woman who drove a Ford Falcon. [*Id.*].[12] But upon learning that this statement was false, Respondent states that law enforcement ceased their search for the woman. [*Id.*]. In reply, Petitioner does not directly refute this point. [*See* Doc. 181 at 6].[13] However, Petitioner further details in his reply that Agent Davenport states in the SMM documentary "that he found and interviewed a short, dark-haired woman, who drove a Ford Falcon, who 'couldn't tell us where she was the night Tommy [Griffin] disappeared.'" [*Id.* at 3]. According to Petitioner, no interview of this woman was ever disclosed to his attorneys. [*Id.*].

But before the Court addresses whether the Petitioner is entitled to discovery, it must first identity the essential elements of his claim. *See Bracy*, 520 U.S. at 904 (stating that "[b]efore

---

[11] Petitioner does not explain how the Ford Falcon list or information regarding the woman who drove a Ford Falcon could be exculpatory as it relates to Branam's murder. [*See* Doc. 174].

[12] According to Petitioner, Agent Davenport's commentary in the SMM documentary indicated that law enforcement investigated every Ford Falcon "in the 'area'" and a woman who Petitioner "said Griffin left Blount County *Jail* with." [Doc. 174 at 7 (emphasis added)]. However, Respondent states that Agent Davenport's commentary indicated that law enforcement investigated a woman based on Petitioner's statement to law enforcement that Griffin left a *bar* with the woman. [Doc. 180 at 8]. According to Respondent, the evidence at trial established that Griffin did in fact leave the bar with Sutton and Petitioner—not the woman who drove a Ford Falcon. [*Id.* (citing *State v. Dellinger*, 79 S.W.3d 458, 462 (Tenn. 2002))].

[13] Although Petitioner, in his reply, acknowledges Respondent's argument, he merely states that "it is factually disingenuous[.]" [Doc. 181 at 6].

10

addressing whether petitioner is entitled to discovery, his claim's essential elements must be identified"). Under *Brady*, "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the [prosecution's] good faith or bad faith." 373 U.S. at 87; *see U.S. v. Bagley*, 473 U.S. 667, 682 (1985) (stating that "evidence . . . is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different"). To establish a *Brady* violation, a defendant must show that the evidence at issue is favorable to the accused as exculpatory or impeaching, the state suppressed the evidence, and the evidence was material. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). A petitioner, however, is not required to prove the elements of *Brady* to justify discovery; a petitioner "rather . . . must show that, if the facts are developed through the discovery he seeks, he *could* prove a constitutional violation and would be entitled to relief." *Stojetz v. Ishee*, No. 2:04-cv-263, 2007 WL 928630, at *11 (S.D. Ohio Mar. 27, 2007) (emphasis added) (citing *Harris*, 394 U.S. at 299).

Petitioner, nonetheless, has failed to set forth specific allegations of fact that give the Court "reason to believe that . . . [he] may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief" under *Brady*. *Harris*, 394 U.S. at 300. Petitioner solely relies on Agent Davenport's statements made during the SMM documentary to support his claim that the prosecution withheld exculpatory evidence. While Petitioner maintains that the SMM documentary is of no legal significance as to the documentary's "legal and factual 'conclusions,'" he submits that it is "highly relevant" to his *Brady* and actual innocence claims. [Doc. 181 at 2]. However, Petitioner fails to sufficiently explain what impact the alleged *Brady* evidence would have had if he had been in possession of it prior to trial, for example, to impeach witnesses or to attack the State's theory that Petitioner and Sutton were the last two individuals seen with Griffin

11

before his murder when they both bailed Griffin out of Blount County Jail. *See Bagley*, 473 U.S. at 676 (stating that "[i]mpeachment evidence, . . . as well as exculpatory evidence, falls within the *Brady* rule" and exculpatory evidence is that which "'is favorable to an accused'" (quoting *Brady*, 373 U.S. at 87))).[14]

According to the evidence presented at Branam's murder trial, at least two witnesses for the State testified that Petitioner bailed Griffin out of jail on February 21, 1992—the date of Griffin's disappearance. [*See* Doc. 149-16]. The first witness, Ray Herrin, who worked at the Blount County Sheriff's Department that night testified that he saw Petitioner bail Griffin out of jail. [Doc. 149-16 at 48–49, 51]. The second witness, Lieutenant Thomas DeFoe, also testified that he was in the jail lobby when he observed Petitioner, Sutton, and Griffin leave the jailhouse together. [*See id.* at 67–68]. On cross-examination, Lieutenant Defoe acknowledged that he could not see if anybody was outside the jailhouse when Petitioner, Sutton, and Griffin left together. [*Id.* at 71:5–17]. Petitioner, however, does not explain how having possession of the Ford Falcon list or information regarding the woman prior to trial could have been used to impeach the State's witnesses or could have otherwise led to a reasonable probability of a different outcome "in light

---

[14] Petitioner also does not explain how the SMM documentary could support his claims of actual innocence; he merely references to his claims of actual innocence in one sentence in his motion, stating " [t]his Honorable Court has already held that evidence of Mr. Dellinger's actual innocence is 'at a minimum' relevant to excuse any procedural default under *Schlup v. Delo*, 513 U.S. 298, 315 (1995)." [Doc. 174 at 9 (quoting Doc. 165)]. In support of this statement, he cites to this Court's February 5, 2020 Order in which this Court granted Petitioner's prior discovery motion "solely as to the NC SBI file." [Doc. 165 at 12]. But this Court's decision was premised on Petitioner's prior discovery motion "based on . . . *evidence*" that, Petitioner argued, "presented . . . a compelling case of actual innocence[.]" [Doc. 130 at 14 (emphasis added)]. Petitioner, however, in his present motion, does not make an independent showing as to how the discovery he seeks could demonstrate his actual innocence to excuse any procedural default. *See Muntaser v. Bradshaw*, 429 F. App'x 515, 521 (6th Cir. 2011) (stating that "an actual innocence claim operates only to excuse a procedural default so that a petitioner may bring an independent constitutional challenge").

of the evidence and the state court proceedings." *Stanford*, 266 F.3d at 460; *see Williams*, 380 F.3d at 976 (holding that the district court did not err in denying the petitioner's discovery motion when the petitioner "ma[d]e[ ] no effort to explain how" the requested discovery could support his ineffective assistance of counsel claim in light of the trial evidence).[15]

Moreover, while it is clear that no information or interview with regard to the woman who drove a Ford Falcon was provided to counsel, it is less clear that such information lends itself to an exculpatory inference that Petitioner merely suggests. While information about this woman and her interview might have been of interest to Petitioner, he offers only speculation and conclusory statements that such information would have been exculpatory. *See Gumm v. Mitchell*, 775 F.3d 345, 364 (6th Cir. 2014) ("Prosecutors are not necessarily required to disclose every . . . lead . . . but they must disclose the existence of 'legitimate suspect[s][.]'" (quoting *D'Ambrosio v. Bagley*, 527 F.3d 489, 498–99 (6th Cir. 2008))). Petitioner's position that the Ford Falcon list and information regarding the woman are "clearly exculpatory" is also belied by his statement that Agent Davenport explained during the SMM documentary that law enforcement did in fact investigate "every Ford Falcon" due to "[Petitioner's] and Sutton's insistence that Griffin had left [the jailhouse] with the woman driving the Ford Falcon." [Doc. 174 at 7 n.3].[16]

---

[15] The State record also reflects that Sutton testified at trial that Griffin left the jailhouse with the woman. [Doc. 149-24 at 34:9–25]. But again, Petitioner offers no argument as to how having information regarding the woman or the Ford Falcon list in his possession prior to his trial could have led to a reasonable probability of a different outcome despite the jury having heard this testimony. *See Spirko v. Mitchell*, 368 F.3d 603, 610 (6th Cir. 2004) ("[W]here the defendant was 'aware of the essential facts that would enable him to take advantage of the exculpatory evidence,' the government's failure to disclose it did not violate *Brady*." (quoting *U.S. v. Todd*, 920 F.2d 399, 405 (6th Cir. 1990))).

[16] This Court previously denied Petitioner's second discovery motion when he "offer[ed] nothing but mere speculation that another investigation of the [tire] tread impressions w[ould] result in more conclusive results." [Doc. 122 at 7]. This Court noted that Petitioner offered no argument that prior testing of the tire tread impressions was insufficient based on the evidence

13

Petitioner acknowledges that he cannot demonstrate materiality without evidence [Doc. 181 at 8], but at this point, in requesting discovery, he must be able to show that, if the facts are developed through the discovery he seeks, he *could* prove a constitutional violation under *Brady*. *Stojetz*, 2007 WL 928630 at *11. Because Petitioner's discovery request—as it relates to subpoenaing the TBI's "complete files" to obtain the Ford Falcon list and information regarding an unidentified woman who drove a Ford Falcon—is speculative in nature, Petitioner has failed to demonstrate good cause under Rule 6. [Doc. 174 at 5].

### 3. "Chief" and "Cowboy"

Petitioner argues that the TBI file is also the "best source[ ]" to locate information regarding "Chief" and "Cowboy." [Doc. 174 at 11]. According to Petitioner, Agent Davenport revealed during the documentary that "Chief" and "Cowboy" argued with Griffin at Howie's Hideaway on February 21, 1992. [*Id.*]. Petitioner states that the prosecution never disclosed information regarding these two alternative suspects to Petitioner's attorneys and that the information is also material to his *Brady* claim. [*Id.*].

In opposition, Respondent states that the documentary indicated that law enforcement eliminated "Chief" and "Cowboy" as suspects. [Doc. 180 at 7–8]. According to Respondent, the documentary discussed "Chief" and "Cowboy" for purposes of detailing law enforcement's thorough efforts to question all possible suspects. [*Id.* at 8]. Respondent therefore maintains that "the fact that investigators questioned and eliminated individuals . . . as suspects does not establish good cause to attempt to discover more about these individuals." [*Id.*].

---

presented at trial. [*Id.*]. Similarly, in Petitioner's present motion, he merely speculates that information in the TBI file could lead to exculpatory evidence in support of his *Brady* claim and that another investigation into this information could somehow yield a different result, despite acknowledging that Agent Davenport interviewed the woman and investigated every Ford Falcon.

14

Petitioner, in his reply, does not directly rebut that law enforcement eliminated "Chief" and "Cowboy" as suspects, but states that Respondent's analysis is "factually disingenuous,"[17] and it "asks this court to determine the materiality of suppressed evidence, while being denied the opportunity to see or review the suppressed evidence." [Doc. 181 at 6].[18] Also, although he acknowledges that suppressed evidence regarding "Chief" and "Cowboy," *on its own*, may "not produce a reasonable probability of a different outcome," he states that this evidence should be viewed "cumulatively" with suppressed evidence regarding Johnson, the woman, and the Ford Falcon list. [*Id.* at 9].

Petitioner, however, falls short of showing good cause for discovery under Rule 6. This discovery request, again, is premised on the SMM documentary that Finn admits in her declaration is "clearly sensational" and which she does not regard as "authoritative." [Doc. 171-1 ¶ 12]. Similar to his request relating to the Ford Falcon list and woman, Petitioner does not explain how information regarding "Chief" and "Cowboy" could entitle him to relief under *Brady* "in light of the evidence and the state court proceedings," *Stanford*, 266 F.3d at 460. According to the evidence presented at the trial for Branam's murder, at least one witness testified that Petitioner and Sutton were with Griffin at Howie's Hideaway.[19] But again, Petitioner does not explain how

---

[17] Although Petitioner acknowledges Respondent's argument in his reply, he merely states that Respondent's argument that "Chief" and "Cowboy" were eliminated as suspects is a "bald-faced assertion that . . . should be entitled to no weight whatsoever." [Doc. 181 at 8].

[18] Petitioner, in his reply, elaborates on his request for information regarding "Chief" and "Cowboy" that he expects to find in the TBI file. He states, for the first time in his reply, that "it is likely that suppressed interviews [in the TBI file]" will reveal information regarding a drug-related feud involving "Chief," "Cowboy," and Griffin. [Doc. 181 at 3–4]. His argument is premised on Agent Davenport's reference in the SMM documentary to a drug-related feud involving Griffin in which he states that "'we were told there was a feud, there were drugs involved.'" [*Id.* at 4].

[19] Terry Lynn Lilly was one of the witnesses who testified for the State at Petitioner's trial. Ms. Lilly testified that she worked at Howie's Hideaway on February 21, 1992. [Doc. 149-14 at

15

evidence relating to "Chief" and "Cowboy," even when viewed cumulatively with the alleged exculpatory evidence he seeks from the TBI file relating to Johnson, the woman, or the Ford Falcon list, could have been used to impeach the State's witness or could have otherwise been exculpatory. As mentioned above, Petitioner, in his reply, does not directly refute that law enforcement eliminated "Chief" and "Cowboy" as suspects [*see* Doc. 181 at 6], and Finn states in her declaration previously filed with the Court that law enforcement indicated in the documentary that they did in fact eliminate "Chief" and "Cowboy" as suspects [Doc. 171-1 ¶ 12(a)]. Petitioner, therefore, merely speculates and relies on conclusory allegations that information regarding "Chief" and "Cowboy" could entitle him to relief under *Brady*. For these reasons, Petitioner fails to show good cause for discovery, as it relates to subpoenaing the TBI's "complete file" to obtain information about "Chief" and "Cowboy." [Doc. 174 at 5]; *see Stanford*, 266 F.3d at 460.

### III.  MOTION TO EXTEND DISCOVERY

Petitioner timely requests[20] an extension of the discovery deadline for two reasons, which he states are beyond counsel's control: (1) the COVID-19 pandemic, which prevents Finn from traveling and conducting in-person interviews; and (2) the destruction of the NC SBI notes. [Doc. 174 at 11]. In his Memorandum, Petitioner points to Finn's diligence in her investigation as grounds for good cause for an extension. [*Id.* at 10]. He argues, moreover, that the pandemic has

---

20–22]. She testified that "just the three of them [Petitioner, Sutton, and Griffin]" were together. [*Id.* at 23:1–2]. But, again, Petitioner does not offer any argument as to how having information regarding "Chief" and "Cowboy" could have led to a reasonable probability of a different outcome.

[20] As a reminder, on May 15, 2020, this Court granted Petitioner's unopposed motion to "extend the [discovery] deadline set by the Court's February 5, 2020 order" by sixty days from the Court's entry of its Order. [Doc. 166 at 1; *see* Doc. 168]. Petitioner timely filed the present motion on July 14, 2020, before the sixty-day extension expired [*see* Doc. 173].

16

hindered Finn from conducting in-person interviews, which Finn attests is necessary to "fill in the blanks in the record" given that the NC SBI notes have been destroyed. [Doc. 174-1 ¶ 5].

In response, Respondent states that there is no good cause to extend discovery, citing to Rule 16(b)(4) of the Federal Rules of Civil Procedure.[21] [Doc. 180 at 12]. Respondent argues that Finn provides no details as to why she must travel to conduct in-person interviews "besides a generalized assertion concerning . . . lost NCSBI notes." [*Id.* at 15]. Respondent also states that Petitioner's request for an extension due to COVID-19 is a "windfall . . . [that] could create a seemingly endless period of discovery." [*Id.* at 13].

Petitioner replies that "justice would benefit" should the Court grant an extension. [Doc. 181 at 13]. Although he acknowledges that he could amend his Petition based on the information that he has now, he states that "the complaint [Petition] would be more likely to be factually accurate" if Finn had a full and fair opportunity to complete her investigation. [*Id.*].

The Court is mindful and sympathetic to the "unprecedented magnitude" of the COVID-19 pandemic. *U.S. v. Boatright*, No. 2:19-cr-00301, 2020 WL 1639855, at *5 (D. Nev. Apr. 2, 2020). Generalized COVID-19 concerns, however, are not good cause to extend discovery, and courts have recognized the need to move litigation forward by conducting discovery through remote means. *See, e.g.*, *Swenson v. GEICO Cas. Co.*, No. 2:19-cv-01639, 2020 WL 4815035, at *3 (D. Nev. Aug. 19, 2020) ("[M]ere reference to the pandemic is not a golden ticket that provides the movant admission into the chocolate factory."); *Wilkens v. ValueHealth, L.L.C.*, No. 19-1193-EFM-KGG, 2020 WL 2496001, at *2 (D. Kan. May 14, 2020) ("Video or teleconference

---

[21] Rule 6 of the Rules Governing Section 2254 Cases is silent regarding extensions for discovery. Rule 16 of the Federal Rules of Civil Procedure sets forth the standard for when a party seeks to modify a deadline set by the court, which requires the "judge's consent" and a showing of "good cause." Fed. R. Civ. P. 16(b)(4).

17

depositions and preparation are the 'new normal' and most likely will be for some time. Litigation cannot just come to an indefinite halt."); *Ogilvie v. Thrifty Payless, Inc.*, No. C18-0718JLR, 2020 WL 2630732, at *2 (W.D. Wash. May 12, 2020) (holding that the parties' request to extend discovery so that they could conduct in-person meetings was not a basis for good cause because "[t]his pandemic may well be with us for many months to come . . . . [and] litigation [must] mov[e] forward[.]").

Petitioner has not shown good cause for a ninety-day extension of discovery. Finn states her personal preference, based on her professional experience, to conduct in-person interviews of witnesses and expresses that in-person interviews "very often reveal information that phone calls do not." [Doc. 174-1 at 4]. She does not, however, proffer any reason as to why interviews cannot be conducted remotely by another means. *See Rouviere v. DePuy Orthopaedics, Inc.*, No. 1:18-cv-04814, 2020 WL 3967665, at *3 (S.D. N.Y. July 11, 2020) (holding that plaintiff's request to conduct in-person interviews was not a good cause basis to extend discovery, because remote proceedings are the "new normal"); *see also Swenson*, 2020 WL 4815035 at *4 ("flatly reject[ing] . . . [COVID-19] concerns because 'the remote deposition structure eliminates those concerns'" (citation omitted)); *Velicer v. Falconhead Capital, L.L.C.*, No. C19-1505, 2020 WL 1847773, at *2 (W.D. Wash. Apr. 13, 2020) (holding that there was no good cause to grant the parties' stipulated motion for a ninety-day extension for discovery to allow them to conduct in-person depositions when they offered no discussion as to why depositions could not be conducted remotely). Petitioner, therefore, has failed to show good cause to extend discovery.

## IV. CONCLUSION

For the foregoing reasons, Petitioner's Motion for Discovery [Doc. 173] is **DENIED** for lack of good cause under Rule 6(a) of the Rules Governing Section 2254 Cases. Petitioner's

18

Case 3:09-cv-00404-TAV-DCP Document 184 Filed 02/09/21 Page 18 of 19 PageID #: 7890

Motion for Extension [Doc. 173] is also **DENIED** for lack of good cause. Pursuant to the Court's March 7, 2019 and February 5, 2020 Orders, Petitioner was to notify the Court within sixty days after the close of discovery—upon receipt of the NC SBI file—if he intended to amend his Amended Petition. [Docs. 146 at 1 & 165 at 12]. Because sixty days have passed since the close of discovery, Petitioner **SHALL notify** the Court within **fourteen days** of this Order's entry as to whether Petitioner seeks to amend his Amended Petition. If Petitioner seeks to amend his Amended Petition, the Court may order the parties to confer regarding an appropriate briefing schedule or to order the parties to appear for a telephonic scheduling conference. [Doc. 146 at 2]. If Petitioner does not seek an amendment, Respondent may, within thirty days of Petitioner's notification, seek leave to amend his Answer to the Amended Petition. [*Id.*].

    **SO ORDERED.**

                      ENTER:

                        */s/ Debra C. Poplin*
                        Debra C. Poplin
                        United States Magistrate Judge